◼ IRVING B. KAHN et al., Appellants-Respondents, v NEW YORK TIMES COMPANY, Respondent-Appellant, and BROADBAND

COMMUNICATIONS SERVICES INCORPORATED et al., Appellants-Respondents. IRVING B. KAHN, Appellant, v NEW YORK TIMES COMPANY, Respondent.—Order of the Supreme Court, New York County (Martin Evans, J.), entered December 7, 1984, which denied plaintiff Irving Kahn and counterclaim defendants' motions for summary judgment on their complaint, denied summary judgment dismissal of defendant New York Times' affirmative defenses and its first through fifth and eighth counterclaims, and denied arbitration of the sixth, seventh and ninth counterclaims, but directed that the parties proceed to arbitrate the calculation of excess construction costs, and gave leave to plaintiffs and counterclaim defendants to move for discovery before the arbitrator, and which order denied defendant's cross motion for summary judgment dismissal of the complaint and for summary judgment on its fifth counterclaim, is unanimously modified, on the law to the extent of granting plaintiffs summary judgment on their complaint, compelling arbitration of defendant's sixth and ninth counterclaims, dismissing the first through fifth affirmative defenses, with leave granted to defendant Times to re-plead the fifth affirmative defense as a counterclaim, and dismissing the first through fifth counterclaims, and the order should otherwise be affirmed, without costs.

Order of the Supreme Court, New York County (Helen Freedman, J.), entered July 2, 1985, which granted plaintiff Kahn partial summary judgment, awarding him $233,334, is modified, on the law, to the extent of granting plaintiff further partial summary judgment, awarding him the March 1984 payment under the consulting portion of the parties' agreement, and the order is otherwise affirmed, without costs.

In 1981, The New York Times Company (The Times) purchased two New Jersey cable television businesses, Audubon Electronics, Inc., owned by plaintiff Irving Kahn, and Cable Systems Inc. (CSI), owned by Kahn, Morty Wolosoff, Milton Hendler and Thomas Troehler. The purchase agreements for the two sales paralleled each other and were intended to have identical meaning. The agreements were executed on July 24, 1980, and the sales closed on March 2, 1981. Since the two companies had still been in the process of constructing their cable television systems, it was agreed that the purchase prices would be based on the value of the systems as completed and that The Times would be entitled to deduct from the purchase prices the amounts of actually incurred completion construction costs which exceeded certain agreed-upon estimates. The Times was also entitled to a separate $10

million claim against the purchase price of the Audubon system, if certain cash-flow tests were not met by the second half of 1982. The agreement provided for other offsets as well.

As the calculations for The Times' construction costs would involve information to which the sellers would have no access, the agreement included a broad covenant by The Times to allow the sellers' representatives to inspect The Times' books and records and consult with Times' officials.

Only a small portion of the purchase price was paid in cash at the closing. The balance was conveyed in the form of five negotiable and five nonnegotiable notes for the Audubon System and four negotiable and two nonnegotiable notes for the CSI system, which notes were to be paid according to a payment schedule spanning six years.

After the closing, Audubon's rights under the agreement were assigned to Irving Kahn. CSI was liquidated and Wolosoff, Hendler and Troehler were appointed as trustees of the CSI Liquidating Trust, but were later removed by a New Jersey court and replaced by the present appellant, Everett Scherer.

As part of the transaction, Kahn and The Times entered into a separate agreement by which Kahn was to receive $2 million for consulting services and $1.4 million for not competing with The Times in the cable television business. These fees were to be paid over a five-year period.

On the due date of the first set of notes, March 1982, The Times maintained that it had already incurred excess construction costs over the amounts of the nonnegotiable notes then due. Having anticipated this, in February of 1982, Kahn and his counsel asserted their position that the sales agreement provided that if a dispute as to the amounts of the excess construction costs was not resolved by the due date of the nonnegotiable notes, those amounts could not be offset against the nonnegotiable notes until a final determination was made. Further, the full amount of the notes had to be paid pending that determination. The Times rejected this position. Nevertheless, the sellers presented their first set of notes for payment. the Times paid the negotiable notes in full but claimed a full right of offset against the nonnegotiable notes of both Audubon and CSI.

At the time of the second anniversary of closing, March 1983, a $7 million Audubon nonnegotiable note, an $8.3 million Audubon negotiable note and a $3 million CSI negotiable note were due and presented for payment. No CSI nonne-

gotiable note was due at the time. The Times paid the negotiable notes in full but paid nothing on the Audubon nonnegotiable note, claiming the right to offset excess construction costs. In March of 1983, The Times advised Kahn of its position that the 1982 cash-flow test had not been met, which if true would entitle The Times to reduce its liability on the 1987, $20 million nonnegotiable note by $10 million.

The sellers then decided to seek disclosure of information from The Times pursuant to section 8 of the agreements. The times refused any disclosure, basing its denial on the sellers' representatives' refusal to execute a confidentiality agreement which would bar the use of any obtained information in litigation or arbitration. The sellers then exercised their rights under the contracts to accelerate the entire series of nonnegotiable notes based upon The Times' refusal to honor the 1982 and 1983 nonnegotiable notes.

An action was commenced on behalf of Kahn and the CSI liquidating trustees shortly thereafter, asserting four causes of action. The first sought payment, on behalf of Kahn as assignee of Audubon, of the five nonnegotiable notes amounting to $38 million. The second, also on behalf of Kahn as assignee, sought a mandatory injunction enforcing the covenant of access to information. The third, on behalf of the CSI liquidating trustees, sought payment of its two nonnegotiable notes in the amount of $3 million. The fourth cause of action on behalf of the trustees also sought mandatory injunctive relief regarding the access to information.

The Times' answer asserted that the nonnegotiable notes never became due, because The Times was entitled to offset the excess construction costs against payments otherwise due on the nonnegotiable notes. It also denied that it had breached its obligation to provide the sellers with access to information. The answer also asserted five affirmative defenses and nine counterclaims. The affirmative defenses were: Kahn's lack of legal capacity to sue; plaintiffs' lack of authorization to do business in New York, thus barring this action pursuant to Business Corporation Law § 1312; The Times' contractual right to offset excess construction costs under section 14 (c) of the agreements; estoppel, laches and waiver; and partial right of offset under the separate $10 million rebate for failure to meet the cash-flow tests for the second half of 1982.

The first counterclaim sought a declaratory judgment that The Times' obligation to pay Kahn the unpaid portions of the consulting and noncompetition agreement was abrogated by

Kahn's wrongful action in bringing this lawsuit. The second counterclaim sought recovery from Kahn of the $1.2 million already paid under the agreement. The third through seventh counterclaims were interposed to Kahn and the trustees of the CSI Liquidating Trust, individually and as trustees, and as counterclaim defendants. The third counterclaim alleged a breach of the contractual obligation of good faith by commencing this action. The fourth alleged prima facie tort in plaintiffs' delay in asserting their claim concerning the offsets. The fifth sought a declaratory judgment to uphold The Times' right to offset the excess construction costs as incurred. The sixth sought a declaratory judgment adjudicating the correct amount of the offsets. The seventh counterclaim alleged that plaintiffs falsely represented they were not in violation of any Federal law or rule when in fact one of their channels was not approved by the FCC, causing The Times to expend $825,000. The eighth counterclaim sought an injunction against disposition of the outstanding $18.7 million in negotiable notes to stand as security for a money judgment The Times might win on its counterclaims. The final counterclaim sought interest of $1,576,000.

Plaintiffs and the counterclaim defendants moved in December of 1983 for summary judgment on the four causes of action, summary judgment dismissal of the affirmative defenses and of the first through fifth and eighth counterclaims, and to compel arbitration of the sixth, seventh and ninth counterclaims. The Times cross-moved in February of 1984 for summary judgment dismissal of the complaint and for summary judgment on its fifth counterclaim.

While these cross motions were pending, on March 2, 1984, The Times failed to pay Kahn the $233,334 due him under the noncompetition portion of their separate agreement and the $333,333 due under the consulting portion. Kahn subsequently commenced a second action seeking the $1.7 million total due him under the agreement on the theory of anticipatory breach. The Times moved for consolidation and Kahn cross-moved for summary judgment on his claim for damages.

By order entered December 7, 1984, Justice Evans denied the cross motions in the first action except to direct that the parties arbitrate the calculation of the excess construction costs and to give leave to plaintiffs to move for discovery before the arbitrator.

On the second action, Justice Freedman, by order entered July 2, 1984, granted Kahn partial summary judgment, awarding him $233,334, representing the March 1984 pay-

ment under the noncompetition portion of the contract between Kahn and The Times. Justice Freedman also granted The Times' motion for consolidation. Kahn appeals from the denial of the summary judgment as to the consulting payments.

Plaintiff Kahn, Scherer, as successor trustee of the CSI Liquidating Trust, and counterclaim defendants, Broadband Communications Services, Inc., MHMWTTJH Corp., Wolosoff, Hendler and Troehler, appeal from that part of Justice Evans' order which denied their motion for summary judgment on their complaint and summary judgment dismissal of The Times' affirmative defenses and the first through fifth and eighth counterclaims and which denied the motion to compel arbitration of The Times' sixth, seventh and ninth counterclaims. Defendant New York Times cross-appeals from that part of said order which denied its motion seeking summary judgment on its fifth counterclaim and summary judgment dismissal of plaintiffs' complaint.

The issue of greatest concern to these parties is whether The Times is entitled to offset the excess construction costs against the nonnegotiable notes as the costs occur or only after a final determination of their amount has been made. Regarding this issue section 3 (b) of the Audubon agreement states: "It is understood and agreed that if on the date of any Non-Negotiable Note any claims asserted by the Times against Audubon have not been finally determined (or, if determined, have not been paid or offset). The Times shall be obligated to pay such Non-Negotiable Note on the maturity date except if and to the extent that the aggregate amount of all subsequently maturing Non-Negotiable Notes is less than the aggregate amount of such claims; provided, however, that if the claim shall be finally determined in favor of Audubon, The Times shall be obligated to pay interest as set forth in such Non-Negotiable Note to the holder thereof from the date of its maturity at a rate equal to 1% over the rate of interest charged from time to time by The Chase Manhattan Bank N.A. (Chase) on unsecured loans of 90-day maturity to its prime commercial customers (the 'Chase Prime Rate') on the portion of the Non-Negotiable Note not paid at maturity, but if the claim shall be determined in favor of The Times, then (x) no interest shall be due and owing to such holder on such portion of such Non-Negotiable Note after its stated maturity and (y) The Times shall not receive any interest upon its claim after the stated maturity of such Non-Negotiable Note."

Although the CSI agreement is framed in somewhat differ-

ent language, it is undisputed that its parallel clause was intended to have exactly the same meaning as the one in the Audubon contract. Therefore, for purposes of the instant analysis, we will confine ourselves to a review of the wording of the Audubon agreement.

The agreement provides no valid basis for the claim by The Times that it is entitled to take offsets against the nonnegotiable notes for excess construction costs which have not yet been finally determined. Section 3 (b) expressly states that The Times must pay any nonnegotiable note on the maturity date if on that date any claims asserted by The Times have not been finally determined (by the arbitrator) or, if already determined, have not yet been paid or offset. The only contingency upon which The Times is not required to pay a nonnegotiable note on the due date is when the sum total of The Times' excess construction costs is greater than the aggregate amount of the remaining nonmatured nonnegotiable notes, a contingency The Times did not argue was applicable on this appeal. Under such an event, The Times would have been entitled to offset against the nonnegotiable notes an amount equal to the excess.

Otherwise, according to sections 14 (a) and 3 (b) of the Audubon agreement, The Times may not offset for any questioned "loss, damage, liability or expense" resulting in cost overruns prior to the time that the matter is finally determined by an arbitrator. The latter part of section 3 (b), which obligates The Times to pay an interest penalty on the notes if the arbitrator decides The Times' claims in favor of the plaintiffs, applies only to the exception when The Times' claims exceed the aggregate of the nonnegotiable notes, entitling The Times to an offset prior to final determination.

The Times bases its argument of a right to immediate offsets on one sentence in section 14 (c) of the agreement, the section defining excess construction costs. That sentence provides that if the total construction costs exceed the ceiling amounts, "then the Times shall offset against the Non-Negotiable Notes an amount equal to the amount of the excess as incurred from time to time." The Times interprets this sentence as entitling it to reduce liability on the notes by the amount of its claimed excess costs as soon as those excess costs are incurred.

Such an interpretation, however, would render meaningless and superfluous the more detailed and intricate provisions of section 3 (b), the purpose of which is to delineate how payments are to be made on the nonnegotiable notes. As this

court recently stated: "It is a generally accepted rule of construction that an agreement must be construed to accord a meaning and purpose to each of its parts [citations omitted]. An interpretation which renders a clause absolutely meaningless should be avoided [citations omitted]." *(Graphic Scanning Corp. v Citibank,* 116 AD2d 22, 25.) The proper interpretation of this portion of section 14 (c), which interpretation is consistent with the other provisions in the agreement, is that The Times can only claim those excess construction costs which actually have been incurred and it may not claim any costs on an accrual or projection basis.

Explained in this manner, there is no inconsistency or ambiguity in the various provisions of the contract. In fact, this is the only reasonable interpretation of the agreement, as the interpretation advanced by The Times is not only unsupported by the contract language but is highly inequitable as well. If accepted by the court, it would enable The Times to withhold on a whim, and without any foundation, money which rightfully belongs to plaintiffs. It would compel plaintiffs to resort to extended and expensive arbitration proceedings and litigation while The Times is able to continue in possession of funds which may be owed to plaintiffs. It would, finally, allow The Times to inundate plaintiffs with frivolous and vexatious claims should defendant choose to do so. Under these circumstances, it is difficult to conceive that plaintiffs would have agreed to such an arrangement.

Since the meaning of the two purchase agreements is clear, the plaintiffs should have been awarded summary judgment on the first and third causes of action in connection with the payment of all the nonnegotiable notes.

The two remaining counts of plaintiffs' complaint in the first action seek a mandatory injunction to enforce The Times' contractual covenant, contained in section 8 of the agreements, giving plaintiffs access to information within the exclusive possession of The Times. Section 8 (a) of the Audubon agreement and section 8 (g) of the CSI agreement require that The Times make available to plaintiffs "all of the properties, books, contracts and records of The Times pertaining to the business of operating the System and relevant to the account, claim, offset or indemnity in question, and permit * * * [plaintiff] * * * to make extracts therefrom and to consult with the officers, directors and employees of The Times who possess information relevant to the account, claim, offset or indemnity in question."

The Times, nevertheless, refused to release the information,

purportedly because the plaintiffs' representatives failed to execute a confidentiality agreement which would bar the use of the information in litigation or arbitration. There is no basis in the language of the covenant for imposing such a limitation. In fact, such a limitation would render the covenant meaningless, since clearly its purpose is to dispute The Times' calculation of offsets. Simply put, The Times breached its covenant in refusing to grant access to the requested information. Special Term's ruling on this issue, directing that the plaintiffs apply to the arbitrator for discovery, was unsatisfactory. Arbitrators do not have the power to direct that parties engage in disclosure proceedings, and only under exceptional circumstances will a court order disclosure in arbitration. *(De Sapio v Kohlmeyer,* 35 NY2d 402, 406.) Such a limited disclosure right in arbitration hardly equates with the broad disclosure contractually promised to plaintiffs, which contractual obligation The Times has never denied. Accordingly, plaintiffs' disclosure rights should be enforced by mandatory injunction, and summary judgment on the second and fourth causes of action granted.

The plaintiffs also correctly argue that all five affirmative defenses of The Times should have been dismissed. There is no merit to the first affirmative defense that plaintiff Kahn lacks the capacity to sue, since Kahn has individually assumed all of Audubon's liabilities in return for an assignment of all of Audubon's assets. As to the second defense that plaintiff is not qualified to do business in New York, The Times agrees that this defense is no longer valid since the defect has been cured. The third affirmative defense, that The Times has a right of immediate offset against the nonnegotiable notes, must also be dismissed, as we have determined that the contract language clearly provides that the excess construction costs may be offset against these notes only after a final determination of their amount has been made.

The affirmative defenses of laches, estoppel and waiver should also be dismissed. These defenses are based on allegations that the plaintiffs deliberately concealed their interpretation of the sales agreement with respect to the excess construction cost offsets, inducing The Times to expend substantial amounts of money to complete the systems, thereby severely prejudicing them. Laches, which is an equitable defense, does not lie as a defense to actions at law such as the one here for the payment of moneys due on defaulted promissory notes. *(Matter of Barabash,* 31 NY2d 76, 81.) As to the defense of waiver, it is clear that the sellers raised the issue of

their interpretation as early as February 1982 and continued to present their notes for payment, thus demonstrating their lack of acquiescence in The Times' position on the immediate availability of the offsets. Nor is there any merit to The Times' assertion of estoppel as a defense.

The fifth affirmative defense asserts the separate $10 million offset (due to the failure to meet the 1982 cash-flow tests) against the fifth Audubon nonnegotiable note for $20 million, pursuant to section 14 (d) of the Audubon agreement. Like the excess construction cost offsets, this offset also had to be finally determined before it could have operated to reduce the payment on the $20 million nonnegotiable note. Section 3 (b) of the agreement is clear in mandating that the nonnegotiable notes must be paid in full on their maturity if *"any claims asserted by the Times * * * have not been finally determined"* (emphasis added). Thus, The Times has no more right to deduct on an automatic basis this $10 million offset than it does to deduct automatically the excess construction costs. Additionally, as with the excess construction costs, sections 14 (d) and 15 explicitly provide that any dispute as to the computations relevant to this offset must be arbitrated.

Since we have awarded plaintiff Kahn summary judgment on all five nonnegotiable notes, based on defendant's default and acceleration of the notes, and The Times has not yet submitted this claim to arbitration for final determination, the agreement does not authorize defendant to take advantage of this $10 million nonfinalized claim in satisfying its debt on the $20 million nonnegotiable note. Defendant alone caused the dilemma in which it now finds itself by failing to bring this matter to arbitration for final determination when it was first aware in March 1983 that the cash-flow test had not been met. Had it done so it could have taken full advantage of this claim. Accordingly, we grant plaintiff's motion to dismiss this affirmative defense. However, plaintiff Kahn is correct in noting that the affirmative defense should have been pleaded as a counterclaim and we, therefore, grant the defendant leave to replead this defense as a counterclaim. In summary, then, all five affirmative defenses are dismissed, with leave granted to defendant to replead the fifth affirmative defense as a counterclaim.

Plaintiffs also moved to summarily dismiss the first through fifth and eighth counterclaims. The subjects of the first and second counterclaims relate to Kahn's second and separate action against The Times and will be treated together. The Times alleges that its obligation to pay Kahn under the

consulting and noncompetition agreement has been abrogated because The Times is no longer able to receive the benefits of Kahn's consulting services due to Kahn's bad faith in belatedly asserting his "specious interpretation of the purchase agreement." Kahn's interpretation regarding the offsets was raised as early as February of 1982, 19 months before the action on the notes was commenced. More importantly, Kahn's interpretation of the contract was indeed correct, as reflected by our decision to grant the plaintiffs summary judgment. Another point to be made is that the consulting agreement obligated Kahn to extend to The Times his expertise in the cable television business with respect to the operation of the business and its dealings with third parties. Kahn was never obligated to extend his advice on the interpretation of contracts. Thus, in the first action, The Times' first two counterclaims should have been summarily dismissed. In the second action, Kahn should have been awarded partial summary judgment granting him the March 1984 payment for his consulting services.

The third counterclaim alleges that the sellers acted in bad faith in initially acquiescing to The Times' position on the offsets and then belatedly asserting their claim that there was no automatic right to the offsets. As discussed above, notice was given of the sellers' position as early as February of 1982, prior to the due date of the first series of notes. Also, the notes were presented for payment in 1982 and 1983. Finally, the sellers' interpretation of the contracts on the offset issue has been upheld. This counterclaim should be dismissed.

The fourth counterclaim is plainly one for prima facie tort and equally plainly subject to summary dismissal. A cause of action based on malice is inappropriate where the allegations complain solely of plaintiffs' failure to assert their contractual interpretations. The fifth counterclaim, seeking a declaratory judgment that The Times is entitled to an immediate offset, must also be dismissed, given our resolution of the offset issue. There is no harm, however, in sustaining the eighth counterclaim, seeking injunctive relief against the disposition by plaintiff and the counterclaim defendants of the negotiable notes so as to provide The Times with security for any judgment it might obtain.

The last issue to be resolved is whether in the first action Special Term should have directed that the sixth, seventh and ninth counterclaims be arbitrated. Section 15 of both agreements provides for a limited right of arbitration of, *inter alia,* items primarily dealing with accounting matters or matters of

calculation which also may affect a representation, warranty or may give rise to an offset against any nonnegotiable note.

By directing arbitration of the issue of the amount of the excess construction costs, it appears Special Term intended to have the sixth counterclaim arbitrated. We explicitly rule that the sixth counterclaim, seeking a declaratory judgment as to the correct amount of the construction cost offsets, should be arbitrated. The seventh counterclaim concerns an alleged breach of warranty with respect to an FCC violation, which required the expenditure of money to correct. Because it is the underlying FCC issue which is the primary issue and not a calculation of the costs incurred to correct the violation, this is not a properly arbitrable claim. The ninth counterclaim seeks interest on The Times' excess construction costs and is primarily a matter of calculation directly related to the offset issue. Thus, the sixth and ninth counterclaims should explicitly be directed to arbitration pursuant to CPLR 7503, subject first to The Times' compliance with the information covenant. In all other respects the orders below are affirmed.

Settle order. Concur—Carro, J. P., Asch, Fein, Milonas and Ellerin, JJ.