**Harold LIEBOWITZ and Advanced Engineering Research & Development Corporation, Plaintiffs,**

v.

**ELSEVIER SCIENCE LTD., f/k/a Pergamon Press, PLC and Elsevier Science, Inc., f/k/a Pergamon Press, Inc., Defendants.**

No. 91 Civ. 4551 (LAK).

United States District Court,
S.D. New York.

June 6, 1996.

As Amended June 7, 1996.

Francis T. Carr, Howard J. Shire, John Flock, Joshua R. Bressler, Kenyon & Kenyon, New York City, for Plaintiffs.

James W. Dabney, Pennie & Edmonds, New York City, for Defendants.

## OPINION

KAPLAN, District Judge.

Plaintiff Harold Liebowitz, former Dean of the School of Engineering and Applied Science at George Washington University, conceived of a scientific journal and persuaded the late media tycoon, Robert Maxwell, who then owned Pergamon Press, to back the idea. Publication began. Over the years, Liebowitz's ideas spawned a number of highly successful journals, all published by Pergamon under Liebowitz's direct or indirect editorship. The contracts between the parties, perhaps reflecting mutual confidence shared by Liebowitz and Maxwell, did not contemplate the possibility that the parties would part ways. In time, however, Pergamon was sold. Relations between Liebowitz and Pergamon's new owners soured. Now they are battling over ownership of the trademarks for the journals, which may well constitute substantially all of the value that inheres in these properties, each apparently trying to capture that value for itself. In view of the lack of guidance in the contracts, the case calls for the application of bedrock principles of trademark law to highly unusual circumstances.

### Facts

Plaintiff, Professor Harold Liebowitz, is the editor-in-chief of two academic journals published by defendants Elsevier Science, Ltd. and Elsevier Science, Inc. (together "Elsevier Science").[1] The journals, COMPUTERS AND STRUCTURES ("C & S") and ENGINEERING FRACTURE MECHANICS ("EFM"), address the application of computers to the solution of engineering problems and the area of fracture mechanics respectively.[2]

Liebowitz conceived of the journals in 1967, when he was Dean of the School of Engineering and Applied Science at George Washington University. In 1967, he and Pergamon entered into an agreement to commence publication of EFM. (Pl. 3(g) Exs. 2 & 3)[3] In 1970, Liebowitz formed plaintiff Advanced Engineering Research and Development Corp. ("AERDCO") for the purpose of producing EFM and other journals.[4] In 1971, Pergamon entered into a second agreement that reconfirmed the EFM publishing agreement and agreed to make payments under it to AERDCO. (Pl. 3(g) Exs. 4 & 5)

Pergamon's task under these agreements was essentially to print, market, and distribute the journal. (*Id.*) AERDCO, in the person of Professor Liebowitz, had the task of editing the journals, including selecting manuscripts for publication. At first, Pergamon agreed to pay Liebowitz, and later AERDCO, a fee, while Pergamon bore any risk of loss. (*Id.* Exs. 3–5)

1. Elsevier Science, Ltd. and Elsevier Science, Inc. are affiliated corporations organized, respectively, under the laws of the United Kingdom and Delaware, and having their principal places of business, again respectively, in London and in Tarrytown, New York. The two entities were known until 1994 as Pergamon Press plc and Pergamon Press, Inc. For present purposes there is no need to distinguish between the British and American entities.

2. These journals have been published since their inception by defendants, or their corporate predecessors, Pergamon Press plc and Pergamon Press, Inc., and have been edited by Liebowitz. Pergamon Press plc and Pergamon Press, Inc., have undergone a number of changes in ownership over time. At the time C & S and EFM commenced publication, Pergamon Press plc and Pergamon Press, Inc. were owned by the Pergamon Holding Foundation, which was controlled by the late publishing magnate Robert Maxwell. In 1986, Pergamon Holding Foundation sold Pergamon Press plc and Pergamon Press, Inc. to the British Printing and Communications Corporation (another Maxwell-controlled entity). British Printing and Communications Corp. later changed its name to Maxwell Communications Corporation plc ("MCC"). In 1991, MCC in turn sold the assets of Pergamon Press plc and Pergamon Press, Inc., apparently including the Pergamon name, to Elsevier N.V. Elsevier has continued to publish the journals under the Pergamon name. In this opinion, "Pergamon" refers to Pergamon Press plc and Pergamon Press, Inc., when describing events prior to Elsevier's acquisition of the businesses, and it refers to Elsevier's journal publishing business conducted under the Pergamon name when describing events subsequent to the acquisition.

3. Plaintiffs' Statement of Material Facts as to Which There Exists a Genuine Issue of Fact to Be Tried, document no. 97 on the Court's docket in this case, is referred to throughout at "Pl. 3(g)."

4. Professor Liebowitz is president of AERDCO and formerly its sole stockholder. Its sole stockholders now are trusts created by Professor Liebowitz for the benefit of his children.

While bringing EFM to fruition, Professor Liebowitz began to consider the creation of C & S. Beginning in 1969, Professor Liebowitz discussed his idea for C & S with Pergamon. In a series of letters during 1969 and 1970, Professor Liebowitz and Pergamon worked out an agreement between AERDCO and Pergamon to publish C & S. (*Id.* Exs. 7–10) As with EFM, Liebowitz became editor-in-chief of C & S and was responsible for procuring manuscripts and assembling an advisory board. Pergamon again agreed to pay a fee to AERDCO and to publish the journal at Pergamon's own risk and expense. (*Id.* Ex. 10) Over time, Pergamon agreed to increase the payments it made to AERDCO for both EFM and C & S, and eventually agreed to pay AERDCO a percentage of subscription revenues received from the two journals. (*Id.* Exs. 25 & 65)

With the success of EFM and C & S, AERDCO and Pergamon developed plans to create a series of journals that would explore the application of computers to a variety of disciplines. This series was conceived in 1970 and 1971 and eventually included an additional dozen titles (the "Computer Series").[5]

Professor Liebowitz continued to serve as editor-in-chief of C & S and EFM, but he did not edit the Computer Series. Instead, under an agreement reached between AERDCO and Pergamon in 1971,[6] AERDCO served as "general editor-in-chief" and appointed and supervised the editors of the individual journals in the Computer Series. (*Id.* Ex. 14A ¶¶ 1 & 3) The editors appointed by AERDCO had the task of gathering appropriate manuscripts for publication. Pergamon agreed to print, market, and distribute the journals in the Computer Series, again at its own risk and expense. In addition to paying a fee for each journal, Pergamon

agreed to pay AERDCO a percentage of all subscription revenue from the Computer Series journals. (*Id.* Exs. 14A ¶ 5 & 14C) Over time various changes were made in AERDCO's compensation for the Computer Series. From 1974 onward, the essence of the arrangement remained that Pergamon would pay AERDCO a fee for the journals plus a bonus for journals that exceeded certain subscription levels. (*Id.* Exs. 16, 25, 28 & 61) The 1971 Agreement was renewed in 1989. (Pl. 3(g) Ex. 25, hereinafter the "1989 Agreement")

The renegotiation of the terms of AERDCO's compensation for the Computer Series that led to the signing of the 1989 Agreement appears to be the first point at which Pergamon ever asserted ownership of the journals. In a letter from its chief executive, Ian Maxwell, Pergamon asserted that it was the "beneficial owner of the journals[.]" It consequently suggested that paragraph seven of the then proposed 1989 Agreement reflect that fact. Attached was a draft in which the proposed paragraph seven stated that AERDCO was responsible for "recommending" to Pergamon the appointment and removal of editors and editorial board members of the Computer Series journals. (*Id.* Ex. 11I) As will be discussed further below, that provision was not incorporated into the final version of the 1989 Agreement, which retained for AERDCO the "responsibility and authority" that it had been given under the 1971 Agreement to make such appointments. (*Id.* Ex. 25 ¶ 7)

The present controversy arose in 1991. In May of that year, Elsevier N.V. purchased the assets, including apparently the Pergamon name and intellectual property, of Pergamon from MCC. Although Elsevier N.V. has disclaimed any interest in the matter, Elsevier Science, doing business as Perga-

---

**5.** In time the series included: Computers & Industrial Engineering, Computers & Electrical Engineering, Computers & Fluids, Computers & Graphics, Computers & Chemical Engineering, Computers & Operations Research, Computers & Education, Computers & Chemistry, Computers & Geosciences, Computers & Mathematics, Computer Languages, and Computers, Environment, & Urban Systems.

**6.** A letter from Pergamon to AERDCO, dated April 28, 1971, states that the terms of their

agreement regarding the Computer Series are contained in three documents: a letter from AERDCO to Pergamon dated February 4, 1971; a letter from Pergamon to AERDCO dated April 5, 1971; and AERDCO's reply, dated April 20, 1971. The April 20 letter is signed by AERDCO and counter-signed by Pergamon. (Pl. 3(g) Ex. 14) These documents are referred to hereinafter as the "1971 Agreement."

mon, thereafter began to assert that they owned the trademarks associated with the journals at issue in this suit. Plaintiffs were of another opinion, and began this lawsuit on July 3, 1991. Understandably, the relationship between AERDCO and Pergamon then began to fray.

At roughly the same time that MCC sold Pergamon to Elsevier N.V., David Rogers, co-editor of COMPUTERS & EDUCATION, informed Pergamon that he intended to resign, effective at year end. (Pl. Cross–Motion 3(g) [7] Ex. 3) Pergamon did not immediately inform plaintiffs of Rogers' impending departure. (*Id.* Exs. 3–5) Instead, in December 1991, Pergamon simultaneously informed plaintiffs of Rogers' decision to leave and of its choice of Rachelle Heller, an untenured associate professor at George Washington University, to replace him. (*Id.* Ex. 6) Plaintiffs swiftly informed Pergamon that they considered Heller unqualified to co-edit the journal and that they intended, pursuant to the 1989 Agreement, to appoint Rogers' replacement themselves. Their choice was to appoint both plaintiff, Harold Liebowitz, and his son, Jay Liebowitz, a tenured professor at George Washington University, to replace Rogers. (*Id.* Ex. 7) A testy exchange of letters ensued in which Pergamon informed the Liebowitzes, *pere et fils,* that it did not consider them "remotely qualified" to co-edit the journal and purported to reject their appointment. (*Id.* Ex. 8) Plaintiffs replied by insisting that, under their agreements with Pergamon, they had the sole authority to appoint editors and that Pergamon forthwith should forward manuscripts submitted to COMPUTERS & EDUCATION to its new co-editors, Harold and Jay Liebowitz, for consideration. (*Id.* Exs. 9 & 10) Pergamon responded that it had "overruled" plaintiffs' appointments and appointed Heller to replace Rogers. (*Id.* Ex. 11)

As relations soured between AERDCO and Pergamon during the course of this litigation, plaintiffs added additional breach of contract claims to the complaint, alleging that Pergamon has refused to provide AERDCO with certain information about the production status of the various journals, cheated AERDCO on calculations of CPI increases and currency conversions that were applied to payments to AERDCO, otherwise failed to pay AERDCO monies due to it for various journals, altered the appearance of the journals without AERDCO's consent in violation of various agreements between Pergamon and AERDCO, and violated its duties toward AERDCO by launching a new journal, ENGINEERING FAILURE ANALYSIS ("EFA"), calculated to compete with EFM. Thus, in addition to seeking a declaration that they, rather than Pergamon, own the trademarks associated with C & S, EFM, and the Computer Series, plaintiffs seek damages for breach of contract and an order terminating the publishing arrangements between AERDCO and Pergamon.

### Prior Proceedings

Pergamon's claim to ownership of the journals, including their trademarks, apparently was based in part on the sales of Pergamon's assets, including goodwill and intellectual property, to MCC and, later, to Elsevier N.V. In the original complaint, plaintiffs sought relief for alleged conversion of the journal trademarks by Elsevier and unjust enrichment of MCC to the extent that Elsevier N.V. paid MCC for the trademarks which, plaintiffs contend, belong to them. Plaintiffs sought also a declaration that they owned the journal trademarks.

Judge Stanton dismissed plaintiffs' unjust enrichment claim for lack of standing, holding that such a claim could be raised only by the buyer, Elsevier N.V., which would have been the party injured by any payment it made to MCC for property that MCC purported to sell but did not own. Judge Stanton dismissed also plaintiffs' claim for conversion, holding that no action for conversion of trademarks is recognized under the state laws potentially applicable to that claim. Noting that neither MCC nor Elsevier N.V. claimed to own the trademarks to the jour-

---

7. Plaintiff AERDCO's Statement of Material Facts as to Which There Exists No Genuine Issue to be Tried, submitted in support of its cross-motion for summary judgment on Count II, document no. 95 on the Court's docket for this case, is referred to throughout as "Pl. Cross–Motion 3(g)."

nals, Judge Stanton dismissed plaintiff's declaratory judgment claim on that question as against those defendants. Pergamon, however, did claim to own the trademarks and Judge Stanton therefore refused to dismiss the declaratory claim against Pergamon, concluding that questions of fact precluded summary judgment on the question whether plaintiffs or Pergamon owned the trademarks.[8] *Liebowitz v. Maxwell,* 32 U.S.P.Q.2d 1683, 1994 WL 517456 (S.D.N.Y. 1994). Pending decision of the ownership dispute, Judge Stanton enjoined plaintiffs from attempting to register the trademarks. *Liebowitz v. Maxwell,* No. 91 Civ. 4551 (LAK) (S.D.N.Y. Dec. 2, 1992).

### The Present Motions

Following Judge Stanton's decisions, plaintiffs amended the complaint to seek a declaration against Pergamon, now renamed Elsevier Science, that plaintiffs rather than Elsevier Science own the journal trademarks. They seek damages for defendants' alleged false designation of origin and for breach of contract. Defendants now seek summary judgment dismissing the complaint. They argue that plaintiffs do not own the trademarks. They contend also that defendants' use of the trademarks is not an actionable false designation of origin because plaintiffs have failed sufficiently to allege likelihood of confusion. Defendants move also to dismiss plaintiffs' contract claims on a variety of grounds. Plaintiffs cross move for summary judgment in their favor on one aspect of their contract claims—the claim that Pergamon's appointment of Heller to co-edit COMPUTERS & EDUCATION violated plaintiffs' contractual right to appoint editors of the Computer Series.

8. Judge Stanton concluded also that certain of plaintiffs' claims were not barred by the statute of limitations, the statute of frauds, or laches.

9. Plaintiffs claim ownership of the "trademarks, titles, trade dress and logos" associated with the journals. (Cpt Prayer for Relief ¶ 6) The ensuing discussion applies therefore both to the journal titles and to the non-functional physical detail and design of the journals including their color schemes, textures, sizes, and shapes, as well as the placement of words, graphics or decorations on the journals, to the extent that such details

### Discussion

Although couched in the language of trademark infringement and unfair competition, this case in reality is a dispute about ownership of the principal assets of a business that plaintiffs and defendants have operated jointly for over twenty-five years. The parties are now, as they have been for many years, engaged in the joint production of one set of goods, marketed under the trademarks at issue.

### The Trademark and Unfair Competition Claims

#### Ownership (Count I)

Plaintiffs seek a declaratory judgment that they own the trademarks related to C & S, EFM, and the Computer Series journals.[9] As the case has been framed as a dispute about the ownership of trademarks, it is useful to begin by considering what a trademark is and what it means to own a trademark.

■ A trademark is, essentially, a designation of origin. *Manufacturing Co. v. Trainer,* 101 U.S. 51, 53, 25 L.Ed. 993 (1879). It serves to inform the public of the source of the goods. As the public comes to know a trademark, it relies on the trademark as a sign that the goods sold under that trademark are of the same quality as goods that it has purchased from that source before. *Levitt Corp. v. Levitt,* 593 F.2d 463, 468 (2d Cir.1979); *Marshak v. Green,* 505 F.Supp. 1054, 1061 (S.D.N.Y.1981); *Revlon, Inc. v. La Maur, Inc.,* 157 U.S.P.Q. 602, 605 (TTAB 1968). This public association between goods of a certain quality and a trademark benefits the owner of the trademark by making it easy for consumers to find its product and it benefits consumers by allowing them more

indicate the journals' source and distinguish them from the products of others. The Court will not pause over the extent to which some or all of these characteristics more properly are referred to as trade dress, as the characterization of the matter in dispute as trade dress or trademarks is not material to the resolution of the controversy. Accordingly, for simplicity of expression, this opinion speaks only of the "trademarks," recognizing that the word in some instances might be applied inappropriately from a technical standpoint.

easily to find goods of a particular producer that have given them satisfaction in the past. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985).

■ These functions of trademarks have led the law to treat trademarks differently from other species of property. Because the value of a trademark arises from its association with goods of a particular quality and source, a trademark comes into existence only once it is affixed to goods in commerce. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97–98, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918). Likewise, a trademark cannot be transferred except in connection with a business. *Id.; Capital Temporaries of Hartford, Inc. v. Olsten Corp.*, 506 F.2d 658, 663 (2d Cir.1974). Otherwise, the mark would cease to signify the source and quality of the goods to which it once related and the public could be confused or misled by continued use of the trademark. For the same reasons, although a trademark can be licensed, the licensor must retain some degree of control over the quality of the goods marketed under the trademark by the licensee. *Dawn Donut Co., Inc. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir.1959). As all of this illustrates, whoever controls the quality of the goods marketed under the trademark is the source and therefore owns the trademark. *In re Polar Music Int. AB*, 714 F.2d 1567, 1571 (Fed.Cir.1983); *Bell v. Streetwise Records, Ltd.*, 640 F.Supp. 575, 580–81 (D.Mass.), *aff'd mem.*, 787 F.2d 578 (1st Cir.1986). Thus, the answer to the question of ownership of the marks at issue here will be found by determining who controls the quality of the goods. Before determining who controls the quality of the goods, however, the Court must determine what the "goods" are. *Bell*, 640 F.Supp. at 581.

■ What do consumers of the journals in this suit expect to receive when they subscribe to the journals? Plainly, they expect, in large part, scholarly articles in the fields covered by the journals, selected and edited in accordance with the standards to which they have become accustomed.[10] By way of comparison, in cases involving disputes among band members or between band members and their managers over use of the names of various musical groups, the "goods" have been defined as "that quality or characteristic for which the group is known by the public." *Id.* In the case of scientific journals, the quality or characteristic with which the public associates the journals must be, in essence, the nature and quality of the content of the scholarly work published in the journals.[11] Whoever controls the nature and quality of the journals' content, then, is the source of the goods and the owner of the journal trademarks.

As a matter of logic, there are three possibilities. If the source is plaintiffs, then the public would be deceived by defendants' continued use of the trademarks, and plaintiffs may be entitled to an injunction against such use. If defendants are the source, then their continued publication of the journals would create no confusion, and both plaintiffs' declaratory judgment and false designation of origin claims should be dismissed. Finally, if the source is not uniquely plaintiffs or defendants, but some combination of their joint efforts, then the public would be confused by either party's independent production of the journals without the other's input. *See Durango Herald, Inc. v. Riddle*, 719 F.Supp. 941, 951–52 (D.Colo.1988) (extinguishing trademark owned by defunct joint venture where former co-venturers could not agree on subsequent use of trademark). In such circumstances, neither party would be enti-

10. This assumes, for the sake of discussion, that the marks are distinctive. *See* n. 16, *infra.*

11. While defendants have not pressed the point, subscribers surely expect also that the content will be presented readably and that it will be delivered to them in accordance with the terms of their subscription agreements. Indeed, plaintiffs concede that this is an important aspect of the journal publishing business. (Pl. 3(g) ¶¶ 5–6) The journals thus present a combination of intellectual content and substantive editing, packaging and technical editing, and subscription fulfillment. At bottom, however, as plaintiffs point out, without their content the journals are no more than "bound printed paper and glue[.]" (Pl.Mem. at 8)

tled to make continued use of the trademarks without the consent of the other.[12]

Plaintiffs contend that they have controlled the quality of the journals' content. They note that Liebowitz has been the editor-in-chief of C & S and EFM, and AERDCO the general editor-in-chief of the Computer Series. (Pl. 3(g) Exs. 4, 7, 11D ¶ 1 & 14A ¶ 1) With regard to EFM, Liebowitz agreed to "maintain the quality and establish guidelines for acceptance and rejection on manuscripts." (Pl. 3(g) Ex. 4) Gilbert Richards, an employee of Pergamon Press Ltd. who dealt with Liebowitz at times on behalf of Pergamon, testified that "Pergamon relies on the reputation and knowledge of Professor Liebowitz, which is well known, to ensure that the quality of the material published in [EFM] is maintained." (Richards Dep. at 25:13–16, Pl. 3(g) Ex. 13) As for C & S, Liebowitz agreed to select appropriate manuscripts personally or in consultation with the advisory board that he assembled. (Pl. 3(g) Ex. 10) Under the 1971 Agreement, AERDCO was given "responsibility and authority" to appoint editors and advisory boards of the journals in the Computer Series. (Pl. 3(g) Ex. 11D ¶ 4) On AERDCO's behalf, the editors, in turn, were to gather and submit manuscripts to Pergamon for publication. (Id. ¶ 5) Affidavits of many past and current editors of the Computer Series make clear their belief that they served at Liebowitz's pleasure and acted on his behalf. (Pl. 3(g) Ex. 30) Pergamon's managing director, Michael Boswood, testified that, "We do not attempt to assess the quality of individual papers because that is what we have external editors for. There would be no point in trying to duplicate their work." (Boswood Dep. at 25:2–5, Pl. 3(g) Ex. 42) Robert Miranda, who was vice president of the Journal Division at Pergamon Press, Inc. at the time the 1971 Agreement was reached, testified that the fees Pergamon agreed to pay AERDCO were in return for AERDCO's work "to make sure that the quality control of those journals was good." (Miranda Dep. at 147:19–20, Pl. 3(g) Ex. 1)

The evidence, however, is not entirely one-sided. Although plaintiffs contend that no one ever was appointed editor of one of the Computer Series journals without Liebowitz's approval until the disputed appointment of Heller to edit C & E, it is not clear whether Liebowitz actually appointed all of the editors or merely acquiesced in appointments made by Pergamon. Moreover, Boswood testified that Pergamon, in addition to relying on Liebowitz, assessed the quality of the journals by reviewing the frequency with which the journals are cited in other scientific publications, by monitoring the volume of manuscript submissions, and by monitoring the journals' subscription levels. (Boswood Dep. at 24:8–22, Pl. 3(g) Ex. 42) Pergamon also prepared quality control reports in which Pergamon staff called to Liebowitz's attention concerns regarding various journals. (See, e.g., 9/29/78 Report ¶¶ 9 & 12, 3/85 Report ¶¶ 12 & 14, Pl. 3(g) Ex. 59)[13] Thus, while its full extent is unclear, it appears that defendants had some degree of involvement in controlling the quality of the journals.[14]

---

12. *Id.; see also Bell v. StreetWise Records, Ltd.*, 761 F.2d 67, 76 (1st Cir.1985) (Breyer, J., concurring); 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16.14[c][3] (3d ed. 1995). Such a result, of course, would be most unfortunate since it would destroy what appears to be a very valuable asset. *See* n. 16, *infra*.

13. Plaintiffs allege, however, that these reports were prepared at Liebowitz's request and insistence. (Pl. 3(g) ¶¶ 126–28)

14. Plaintiffs, of course, do not dispute that Pergamon has been involved in the production of the journals all along. Plaintiffs claim, however, that defendants were merely licensees, authorized by plaintiffs to publish the journals using plaintiffs' trademarks. Plaintiffs contend, therefore, that they have, and have exercised, the right to revoke defendants' license to use the trademarks. Plaintiffs buttress their contention that they own the trademarks, and that defendants were merely licensees, by offering evidence of a number of unusual features in their relationship with defendants. They note the fact that defendants pay AERDCO an amount of money each year which, according to the uncontradicted declaration of an expert witness offered by plaintiffs, far exceeds what normally would be paid by a publisher in the scientific journal industry to anyone retained to edit a journal actually owned by the publisher. (Wittman Decl. at 8–9, Pl. 3(g) Ex. 58) Plaintiffs have offered evidence that the arrangement according to which plaintiffs have appointed editors of the journals, like the compensation paid to plaintiffs by defendants, was highly unusual for Pergamon, which ordinarily retains the right to appoint editors of journals it

It is defendants' burden on their motion for summary judgment to show that plaintiffs have failed to come forward with evidence to support a necessary element of their claim or that there is no genuine dispute as to any material fact. Plaintiffs have produced evidence which, if credited, would permit a trier of fact to find that they controlled the quality of the journals' content. The only doubt on defendants' motion is the degree to which defendants were significantly involved in quality control. Thus, defendants have failed to demonstrate that there is no genuine question of fact as to whether the defendants controlled the quality of the journals.

■ Defendants attempt to save their motion with the contention that ownership of a trademark confers no more than a right to ensure that the public is not confused as to the source of the goods marketed under the trademark. They argue that plaintiffs cannot show any likelihood of such confusion. Defendants point out that the journals always have carried Pergamon's own trademarks—the name "Pergamon" and Pergamon's colophon, a Greek coin bearing the head of the goddess Athena—in addition to the journals' distinctive titles and cover designs. This, they argue, shows that they are the source of the goods and ensures that the public is not confused as to source because Pergamon is clearly identified on the journal covers. Hence, they contend, that both plaintiffs' declaratory judgment and false designation of origin claims should be dismissed.

■ In addition to assuming the point at issue, however, defendants' position mistakenly regards the public's perception as determinative of ownership. *See Bell,* 640 F.Supp.

at 580–81. Regardless of whether the public believes Pergamon to be the source of the journals, the source of the journals is whoever controls the quality of the journals.[15] If that source were held to be plaintiffs, defendants' placement of their trademarks on journals marketed without plaintiffs' quality control under the journal titles and cover designs would not alter this analysis. Surely Pergamon could not lawfully market a cola-flavored soda in a red and white can marked "Coca–Cola" simply by affixing its own "Athena colophon" trademark as well. *See, e.g., A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir.1972) (one may not escape liability for using another's trademark simply by adding one's own trademark to the goods); *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 662 (2d Cir.1970) (same); *Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.,* 217 U.S.P.Q. 617, 620, 1982 WL 51044 (S.D.N.Y.1982) (same). With or without Pergamon's trademark on the cover of the journals, consumers likely would be confused if plaintiffs and defendants independently marketed competing journals under the same titles and cover designs to the same audiences. Accordingly, defendants' motion for summary judgment dismissing Count I is denied.

### False Designation of Origin (Count XI)

■ In addition to seeking a declaratory judgment that they own the trademarks, plaintiffs assert that defendants are infringing their trademarks by continued use without plaintiffs' consent, in circumstances in which plaintiffs' ability to control the quality of the journals allegedly has been curtailed. This, plaintiffs say, deceives the public as to the nature of the goods being sold under the

---

publishes except when the journals are actually owned by another entity. (I.R. Maxwell Dep. at 104, Pl. 3(g) Ex. 15) Finally, plaintiffs note that the agreements between AERDCO and Pergamon never indicated that Pergamon owned the journal trademarks, and they offer evidence that this, too, is highly unusual. (Wittman Decl. at 9, Pl. 3(g) Ex. 58) All of this, plaintiffs contend, shows that they own the journal trademarks and that Pergamon published the journals as plaintiffs' licensee. Ultimately, however, none of this is relevant except insofar as it goes to the issue of who controlled the quality of the journals.

15. Consumers' ignorance as to the source with which they had associated the goods in the past is irrelevant; the public need not know the identity of the source in order for the source to assert a trademark right. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987); *Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 133 (S.D.N.Y.1972). What matters is not that the public knows the name of the trademark owner, but rather that the public gets the same goods it has come to expect when it buys goods sold under the trademark.

journal trademarks and violates plaintiffs' right to control the quality of goods marketed under their trademarks. Defendants have moved also for summary judgment dismissing this false designation of origin claim.

Traditional analysis of this claim would proceed in two steps. First, plaintiffs would have to show that they possessed rights in the journal trademarks. Second, they would have to establish that the defendants adopted marks that were the same, or confusingly similar to, plaintiffs' marks with the result that consumers of the journals were likely to confuse defendants' products with plaintiffs.' *See Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984). Defendants have failed at this stage to show that plaintiffs lack rights in the journal trademarks.[16] And, as the foregoing discussion demonstrates, that question is inextricably linked to the question whether use of the trademarks by defendants would create a likelihood of confusion.

This is born out by consideration of the traditional factors applied to the question whether likelihood of confusion exists: whether the plaintiff's mark is strong, whether the defendants' mark is similar, whether the products are similar, whether the market and marketing of the products are similar, the intent with which the defendant adopted its mark, and any evidence of actual confusion. *See, e.g., Conagra,* 743 F.2d at 1512; *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). In this case the marks, the products, the marketing, and the markets are not merely similar, they are identical. If one accepts plaintiffs' claims that they have controlled the quality, and therefore have been the source, of the goods, and that defendants have interfered with plaintiffs' control over the quality, then it seems inevitable that the journals currently produced with plaintiffs' impaired supervision are likely to be confused with the journals that previously had been produced under the plaintiffs' supervision, since they are overwhelmingly similar. The absence of evidence of actual confusion would not be determinative of this question. *See, e.g., Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d 251, 253 (2d Cir.1982) (likelihood of confusion is determined with reference to each case's facts and circumstances; no one factor is preeminent or determinative); *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 687 F.2d 563, 569 (2d Cir.1982) (lack of evidence of actual confusion held not dispositive).

Thus, all roads through this dispute lead back to the question of ownership of the trademarks. In reality each side accuses the other of trying to steal the trademarks, and with them the entire business represented by the journals.[17] Plaintiffs and defendants formed a business relationship, the formal nature of which is not specified in their agreements. That business successfully created valuable goodwill, but the parties never addressed the question of to whom such goodwill would belong. Each side now lays claim to the goodwill represented by the journal trademarks. In light of the existence of genuine questions of material fact as to who controlled the quality of the journals, the motion for summary judgment is denied with respect to all of plaintiffs' Lanham Act claims.[18]

---

**16.** The strength and distinctiveness of the marks do not seem to be contested. Indeed if the marks were not strong it seems unlikely that this dispute would have been litigated for some five years. Plaintiff has offered evidence that the value of the journals involved in this suit, estimated by both plaintiffs and defendants to have been approximately $50 million in 1990 and 1991, derives almost entirely from the trademarks. (Wittman Decl. at 5–8 & 10, Pl. 3(g) Ex. 58)

**17.** "Pergamon incredibly now attempts to steal the AERDCO journals from AERDCO ..." (Pl. Mem. 2) "The plaintiffs in this case do not seek to prevent unfair competition with any existing business which the plaintiffs are currently conducting. The plaintiffs seek, rather, to *take over* journal publishing businesses which Elsevier currently conducts ..." (Def. Reply Mem. 5) (emphasis in the original).

**18.** In light of the Court's denial of the motion for summary judgment on the declaratory judgment and false designation of origin claims, in part on the ground that a genuine dispute exists as to ownership of the trademarks, the motion is denied also with respect to Count IX. In that count, plaintiffs assert that defendants have altered the appearance of the covers of the journals without plaintiffs' consent. If plaintiffs prevail on their claim that they own the trademarks,

## The Breach of Contract Claims

### The Heller Appointment (Count II)

█ Both parties have moved for summary judgment on plaintiffs' claim that defendants' decision to appoint Rachelle Heller as co-editor of C & E constituted a breach of contract. The parties agree that determination of this question requires only interpretation of unambiguous contractual language and therefore is suitable for decision as a matter of law. *See Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir.1990) (threshold question whether contract is ambiguous is matter of law for the court); *Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982) (same).

The language at issue first appeared in a letter from AERDCO to Pergamon Press Inc., dated February 4, 1971:

"AERDCO has the responsibility and authority for designating, appointing and removing any Editor, Editor–in–Chief and Advisory Board Members of the Journals in this Series."[19] (Pl. 3(g) Ex. 14A ¶ 4)

The February 4, 1971 letter is incorporated expressly into the 1971 Agreement.[20]

The language contained in the 1971 Agreement was restated in the 1989 Agreement between AERDCO and Pergamon regarding changes to be made in AERDCO's compensation for the Computer Series. As typed for signature, the relevant clause in that agreement read:

"AERDCO has responsibility for recommending to Pergamon Press the appointment and removal of any Editor, Editor–in–Chief, Board Member, Editorial Board Member, or other Appointees on any of the journals subject to this agreement." (Pl. 3(g) Ex. 25 ¶ 7)

Before the Agreement was signed, however, the clause was revised by hand, and initialed by the signatories to the Agreement in the margin adjacent to the changes, so that the clause in fact read:

"AERDCO has responsibility and authority for appointing and removing any Editor, Editor–in–Chief, Board Member, Editorial Board Member, or other Appointees on any of the journals subject to this agreement. In addition, AERDCO will consult with Pergamon Press regarding any such appointments." (*Id.*)

Thus, the record clearly shows that plaintiffs refused to acquiesce in the proposed change and retained control over the appointment of editors.

In the face of this seemingly clear language, defendants assert the unremarkable proposition that their agreement with plaintiffs did not deprive them of the right to hire or otherwise contract on their own behalf and in their own name. They then point out that they in fact signed a contract between themselves and Professor Heller. The rub, of course, is that the contract purports to make Heller co-editor of C & E.

Defendants' assertion that they have the right to appoint Heller to that position clearly impinges on plaintiffs' rights under the agreements. Defendants argue that the contract imposed only a duty or "responsibility" on AERDCO to appoint editors. While it is true that the clause in question imposed such a responsibility on AERDCO, it also gives AERDCO the "authority" to make the appointments. When that grant of authority was initially deleted from the 1989 Agreement, it was reinserted by hand, suggesting that it was an important part of the parties' intent. *See Consolidated Gas Supply Corp. v. Matula*, 42 A.D.2d 656, 345 N.Y.S.2d 206, 207–08 (3d Dept.1973) (handwritten terms ordinarily control over printed terms), *aff'd mem.*, 36 N.Y.2d 790, 369 N.Y.S.2d 698, 330 N.E.2d 647 (1975). The language of the

---

then alteration of the appearance of the journals without plaintiffs' consent would violate plaintiffs' right to control the quality and appearance of goods marketed under their trademarks. *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 435 (7th Cir.1989); *El Greco Leather Products Co., Inc. v. Shoe World*, 806 F.2d 392, 395 (2d Cir.1986), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987);

*Fender Musical Instruments Corp. v. Unlimited Music Center, Inc.*, 35 U.S.P.Q.2d 1053, 1995 WL 241990 (D.Conn.1995).

**19.** The journals in the series, including C & E, are listed elsewhere in the letter.

**20.** *See* n. 6, *supra.*

agreements is clear. As between AERDCO and Pergamon, it was agreed that AERDCO had the "authority" to appoint editors of the Computer Series.[21]

Rather than contest the interpretation of the agreements at much length, defendants reserve most of their effort for an attempt to show that plaintiffs' claim with regard to Heller's appointment is barred by the statute of frauds or that defendants were excused from compliance with their agreements with plaintiffs because plaintiffs had completely breached the agreements prior to defendants' appointment of Heller.

■ The statute of frauds claim, as plaintiffs point out, already has been decided adversely to defendants by Judge Stanton. *See Liebowitz v. Maxwell*, 32 U.S.P.Q.2d 1683, 1994 WL 517456 (S.D.N.Y.1994) (holding that the 1989 Agreement did not violate statute of frauds because defendants could have performed all of their obligations thereunder within one year). Moreover, defendants are estopped to assert the statute of frauds given that they and plaintiffs have long performed under the agreements in question. Indeed, defendants' motion for summary judgment relies heavily on its performance of obligations under the 1989 Agreement in urging the Court to dismiss the complaint. *See Royal Air Maroc v. Servair, Inc.*, 603 F.Supp. 836, 841–42 (S.D.N.Y.1985) (" 'Part performance that is clear, certain and definite in object and design as to be unequivo-

cally attributable to the agreement, and will precipitate a fraud if the agreement is not enforced, removes the action from the defense of the statute of frauds.' "), *quoting Marcraft Recreation Corp. v. Francis Devlin Co., Inc.*, 506 F.Supp. 1081, 1085 (S.D.N.Y. 1981).

■ Defendants contend also that plaintiffs breached the parties' agreements by acting in bad faith to appoint Harold Liebowitz and his son as co-editors of C & E. They argue that "Elsevier was justified in expecting Liebowitz, under the March 1989 Agreement, to help Elsevier locate a successor to Professor Rogers who would be retained and paid by Elsevier to act on *Elsevier's* behalf . . ." (Def.Mem. Cross–Motion for Summ. Judgment 11) (emphasis in the original). The language of the agreement as interpreted above, however, justified no such expectation. In fact, to the extent that the parties' 1971 and 1989 Agreements indicate that the editors were acting on anyone's behalf, they say only that the editors are to submit manuscripts to the publisher "on behalf of AERDCO." (Pl. 3(g) Ex. 14A ¶ 5) Moreover, the only evidence that has been submitted on the question demonstrates that the editors of the Computer Series journals regarded themselves as acting on behalf of Liebowitz, President of AERDCO, the General Editor–in–Chief of the Computer Series. (Pl. 3(g) Ex. 30) A decision by plaintiffs to exercise the "authority" to hire editors, vested in them by

**21.** If the disputed language were ambiguous, which the parties do not claim, extrinsic evidence of the parties' intent would be admissible to aid the Court in interpreting the disputed clause. *Tobin v. Union News Co.*, 18 A.D.2d 243, 245, 239 N.Y.S.2d 22, 25 (4th Dept.1963), *aff'd mem.*, 13 N.Y.2d 1155, 247 N.Y.S.2d 385, 196 N.E.2d 735 (1964). The parties' intent then would be a question of fact, which could only be resolved on a motion for summary judgment if there were no genuine dispute as to any material fact. *Ruttenberg v. Davidge Data Systems Corp.*, 215 A.D.2d 191, 626 N.Y.S.2d 174 (1995). In this case, the Court's interpretation would be the same if extrinsic evidence were taken into consideration.

Plaintiffs have offered the declarations of a number of current and former editors of the Computer Series, all of whom state that they were appointed by Professor Liebowitz and understand that they act or acted on his behalf and

serve or served at his pleasure. (Pl. 3(g) Ex. 30) There is evidence also that no one ever was appointed editor of one of the Computer Series journals over an objection from AERDCO, prior to Heller. (Richards Dep., Pl. 3(g) Ex. 13 at 104) Defendants contend that since the editors of the Computer Series signed contracts with defendants and were paid by defendants it is unreasonable to construe the contract to mean that plaintiffs had final authority to appoint and remove editors. (*See* Def. 3(g) Exs. 28 & 30) (Statement of Elsevier Science Ltd. Under Local Rule 3(g), document no. 93 on the Court's docket in this case, is referred to throughout as "Def. 3(g).") The 1989 Agreement, however, clearly gave AERDCO authority to appoint and remove editors while noting, in a separate paragraph, that Pergamon remains obligated to pay the editors separately from the compensation due AERDCO under the Agreement. (Pl. 3(g) Ex. 25 ¶¶ 5 & 7)

the express terms of the parties' agreements, cannot be characterized as an act of bad faith.[22]

■■■■ Finally, defendants contend that plaintiffs breached their Agreements when they filed this lawsuit in July 1991, thereby precluding liability on the part of defendants for their appointment of Heller in January 1992. Defendants base this contention on assertions made in the first complaint filed in this action, dated July 3, 1991, that the agreement had been terminated by MCC's sale of Pergamon to Elsevier N.V. (Cpt ¶¶ 49(c) & 52) As plaintiffs point out, however, both parties have continued, at least in part, to perform their obligations under the Agreements while they await a determination of plaintiffs' claims. Plaintiffs' continued performance has been acknowledged by defendants in papers filed with the Court and by defendants' continued payments to AERDCO under the agreements. A repudiation which is followed by continued performance cannot be treated as an anticipatory breach, since continued performance amounts to a retraction of any repudiation. *Doyle Dane Bernbach, Inc. v. Avis,* 526 F.Supp. 117, 120 (S.D.N.Y.1981). Nor may defendants continue to accept plaintiffs' performance while claiming that they are excused from further performance by plaintiffs' alleged total breach. *See Dunkin' Donuts of America, Inc. v. Minerva, Inc.,* 956 F.2d 1566, 1571 (11th Cir.1992); *see also Pettit v. Pettit,* 107 N.Y. 677, 679–80, 14 N.E. 500, 502

(1887) (where plaintiff alleged breach by defendant, subsequently refused to perform, and then relented and performed, defendant's acceptance of plaintiff's performance estopped defendant to rely on plaintiff's initial refusal).

In light of the clear language of the agreement, the lack of any evidence tending to contradict it, and the defendants' failure to establish their affirmative defenses, plaintiffs' motion for summary judgment on the question whether defendants' breached their contract by appointing Heller to edit C & E is granted and defendants' motion for summary judgment dismissing this Count is denied.

### The Status Reports (Count III)

■■■ Plaintiffs claim that, in 1975, Liebowitz asked Gilbert Richards of Pergamon to provide status reports, containing information about production schedules, manuscript flow, page budgets, and the like, and that Richards agreed.[23] The record shows that a Pergamon employee named Michael Church did in fact prepare status reports[24] which were sent to plaintiffs roughly quarterly from sometime in the mid–1970s through at least 1988.[25] The cover letters with which the reports apparently were transmitted make occasional reference to the reports as "quarterly" and are replete with apologies for delays in their provision. (*See* Pl. 3(g) Ex. 59) A letter to Liebowitz dated December 13, 1977 makes reference also to providing him with copies of monthly status reports

---

**22.** Conceivably, if plaintiffs' appointed a manifestly unqualified editor, such an action might be regarded as bad faith and, consequently, as a breach of contract. Defendants, however, have introduced no evidence that Jay and Harold Liebowitz were unqualified, other than their letter asserting, without any stated basis, that the two were not "remotely qualified." (Pl. Cross–Motion 3(g) Ex. 8) Indeed, Harold Liebowitz, as president of AERDCO, already was general editor-in-chief of C & E, and Jay Liebowitz apparently was a member of the editorial board of C & E at the time that plaintiffs' appointed him editor. (*Id.* Ex. 9) In consequence, defendants are not entitled to summary judgment, nor may they defeat plaintiffs' motion, on this ground.

**23.** This apparently oral exchange seems not to have been memorialized in any way.

**24.** Plaintiffs define "status reports" as "certain information concerning AERDCO's Journals, such as publication schedules, subscription lists, the subjects of any upcoming special issues, correspondence between Pergamon and editors of the Computer [Series] Journals, reports regarding meetings between Pergamon employees and editors of the Computer [Series] Journals and whether there was any shortage of manuscripts for future issues." (3d Am.Cpt ¶ 36) They contend that this information was "for many years regularly provided" to AERDCO by Pergamon. (*Id.*) Examples appear as Pl. 3(g) Ex. 59.

**25.** The first such report that appears in the record is dated December 6, 1976. (Pl. 3(g) Ex. 59) Six of the eight such reports contained in the record are variously dated from 1976–1979, while one is dated 1985 and the last is dated 1988. (The first seven appear at Pl. 3(g) Ex. 59, the 1988 report is Def. 3(g) Ex. 31)

apparently provided to the individual editors of the Computer Series. (*Id.*)

Eventually, defendants ceased sending Liebowitz the status reports. Defendants indicate that the 1988 report was the last and that Church died later that year. (Def. 3(g) Ex. 31) At a meeting in 1989, it seems that Liebowitz asked Peter T. Shepherd, who apparently replaced Church as editorial director of Pergamon Press plc, to resume providing status reports on the Computer Series journals. Shepherd wrote to Liebowitz after the meeting that he would "arrange for monthly production and circulation reports to be sent to you on a regular basis" for a number of journals, including most of the Computer Series journals, C & S, and some journals not involved in the present suit. (Pl. 3(g) Ex. 60) According to plaintiffs, however, Shepherd never fulfilled this promise. In 1992, after the commencement of this suit, Liebowitz wrote to Richards at Pergamon to demand that Pergamon resume supplying plaintiffs with status reports on the Computer Series journals. (Def. 3(g) Ex. 32) Shepherd responded to that letter for Pergamon, refusing to supply the reports in light of this litigation. (*Id.*) Plaintiffs then added defendants' refusal to supply the reports to their complaint as a cause of action for breach of contract.

Not every promise is a contract. The express terms of the parties' 1971 Agreement regarding the Computer Series make no reference to status reports. Plaintiffs' own statements indicate that any reports provided were provided only after Liebowitz requested such reports in 1975, four years after the 1971 Agreement initiating the Computer Series. It thus seems clear that the reports were not provided pursuant to the 1971 Agreement. For defendants to be bound by any promise to provide the status reports, there must be some contractual obligation independent of the 1971 Agreement.

 Plaintiffs have failed to prove the existence of an implied contract that obligates defendants' to provide the status reports. They have offered no evidence that any consideration was offered by them in return for defendants' alleged promises to provide the status reports. Plaintiffs rely on defendants' intermittent provision of reports from 1976 through 1988 as evidence that defendants were obligated to provide such reports. To the extent that anyone would have an obligation, however, created by defendants' one-sided performance it would be plaintiffs, who have benefitted therefrom. While in some circumstances a contract may be implied by operation of law from the conduct of the parties, this normally is done when one party seeks to collect the benefit due to it in return for a benefit it has conferred on the other party.[26] *See, e.g., Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir.1994). Here plaintiffs seek to impose a continuing obligation on defendants to provide a benefit to plaintiffs without any corresponding obligation on plaintiffs.[27] Without consideration there is no contract. *Roth v. Isomed, Inc.*, 746 F.Supp. 316, 319 (S.D.N.Y. 1990).

Defendants' motion for summary judgment dismissing Count III of the complaint is granted.

### The Pre–1989 Payments (Count IV)

Plaintiffs claim that defendants withheld a portion of the payments due to plaintiffs under their various agreements over a period of years stretching back at least to 1982. Under an agreement reached between AERDCO and Pergamon in 1979 (the "1979 Agreement"), Pergamon promised to pay

---

**26.** Such conduct may be used also to aid in the interpretation of existing, but ambiguous, contracts. *See Ocean Transport Line, Inc. v. American Philippine Fiber Indus., Inc.*, 743 F.2d 85, 91 (2d Cir.1984); *Robinson v. Robinson*, 81 A.D.2d 1028, 1029, 440 N.Y.S.2d 127, 129 (4th Dept. 1981). Here, however, as the Court has held, defendants did not supply the status reports pursuant to the terms of the 1971 Agreement or any other express contract that has been called to the Court's attention. Thus, to prove breach of contract, plaintiffs must prove the existence of an

implied contract obligating defendants to supply the status reports.

**27.** Nor do plaintiffs allege that they relied to their detriment on defendants' alleged promise to provide the status reports. Thus they cannot recover on the ground of promissory estoppel. *R. Freedman & Son, Inc. v. A.I. Credit Corp.*, —— A.D.2d ——, ——, 641 N.Y.S.2d 429, 430 (3d Dept.1996).

AERDCO $120,000 per year, subject to upward or downward adjustment depending on subscriptions. (Pl. 3(g) Ex. 61 ¶ 1) For each journal which, as of the date of the agreement, had more than 450 "library subscribers" and that subsequently should fall below that 450 subscription level, AERDCO's compensation would be reduced by $10,000. For each journal which, as of the date of the agreement, had less than 450 "library subscribers" and that subsequently should rise above 500 subscriptions, AERDCO's compensation would be increased by $10,000. (*Id.*) Plaintiffs contend that subscription data provided to them by defendants in the course of this litigation show that they have been underpaid since perhaps as early as 1981 for two journals that by then had achieved subscription levels above 500.[28]

Defendants assert that in fact they overpaid plaintiffs for certain years during the relevant period, that much of the period falls outside the statute of limitations, and that the entire Count is barred by laches and waiver. Since laches or waiver would dispose of the entire Count, the Court turns first to these defenses.

 Plaintiffs' claim appears to be, principally, for damages caused by defendants' failure to make payments allegedly due under their contract. (*See* Cpt, Prayer for Relief ¶¶ 2 & 4) Such a claim is an action at law, and not a suit in equity. Laches is a defense only against claims in equity and not at law. *County of Oneida, New York v. Oneida Indian Nation of New York State*, 470 U.S. 226, 244 n. 16, 105 S.Ct. 1245, 1256 n. 16, 84 L.Ed.2d 169 (1985); *United States v. Gordon*, 78 F.3d 781, 786–87 (2d Cir.1996); *Golotrade Shipping and Chartering, Inc. v. Travelers Indemnity Co.*, 706 F.Supp. 214, 220 (S.D.N.Y.1989); *Kahn v. New York Times Co.*, 122 A.D.2d 655, 663, 503 N.Y.S.2d 561, 567 (1st Dept.1986). Thus, plaintiffs' laches, if any, is no bar to any claim for damages arising from defendants' failure to make payments due under the contract.

Laches might be available to whatever extent plaintiffs' prayer for an order terminating their various publishing agreements seeks an equitable remedy. (Cpt, Prayer for Relief ¶ 8(b)). The point is of little significance, however, as defendants have failed to prove the absence of a genuine issue as to an essential element of laches.

 Laches is a party's unexcused and unreasonable delay in asserting its rights and prejudice therefrom to another. *Portland Audubon Society v. Lujan*, 884 F.2d 1233 (9th Cir.) (knowledge, or reason to know, of legal right is indispensable element of laches), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1989); *Stone v. Williams*, 873 F.2d 620 (2d Cir.1989) (plaintiff must show "justified ignorance" of facts constituting cause of action), *cert. denied*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *Grant Airmass Corp. v. Gaymar Industries, Inc.*, 645 F.Supp. 1507 (S.D.N.Y. 1986) (laches depends upon plaintiff's actual or constructive knowledge of facts affecting his rights).

 Plaintiffs' demand, in a complaint filed in 1993, for increased payments which may have accrued as early as 1981 certainly exhibits delay. They claim that they were unaware until they obtained discovery in this litigation that C & E and COMPUTERS & CHEMISTRY had exceeded 500 subscriptions more than ten years earlier because defendants had withheld subscription data.[29] Defendants, however, have called the Court's attention to plaintiff Liebowitz's own declaration, in which he stated that "For years, Pergamon also provided me with the circulation figures for each journal." (Dabney Decl. ¶ 4 & Ex. H) Thus it would appear that any failure on plaintiffs' part to realize that they were being underpaid, if indeed they were, was due to their own lack of diligence.

---

**28.** The payment schedule devised by the 1979 Agreement was superseded by a new agreement in 1989. The period covered by Count IV extends therefore only from the date of the first alleged underpayment through the end of 1988. The 1989 Agreement provided that on March 31, 1989 Pergamon would begin making end of quarter payments to AERDCO under the new fee schedule. (Pl. 3(g) Ex. 25 ¶ 3)

**29.** Plaintiffs have produced a document from 1983 showing that defendants were aware that C & E and COMPUTERS & CHEMISTRY had each achieved subscription levels above 500. (Pl. 3(g) Ex. 62)

Lack of diligence, by itself, however, is insufficient to support a claim of laches. The party seeking to prove laches must show also that it has been prejudiced by the other party's delay. *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir.1985). Here, laches is inapplicable because defendants have failed to establish that they were prejudiced by plaintiffs' failure to assert their rights until now. The documentary evidence shows clearly that defendants were aware in 1983 that C & E and COMPUTERS & CHEMISTRY had achieved subscription levels in excess of 500. (Pl. 3(g) Ex. 62) Defendants' protestations now that they have been prejudiced by plaintiffs' delay is unconvincing when they have been aware all along of the existence of a possible claim. The only evidence of prejudice that defendants offer is the death of Robert Maxwell, a witness who might have been able to shed light on the terms of Pergamon's and AERDCO's 1979 negotiations. As plaintiffs point out, however, Pergamon employees Richards and Miranda, both of whom are alive, were closely involved in Pergamon's dealings with AERDCO in 1979. Moreover, the crucial evidence of what the parties intended by the 1979 Agreement is contained in the Agreement itself. Maxwell's testimony would not have been conclusive, and Miranda and Richards are available.[30] At the very least, questions of fact preclude summary judgment in defendants' favor on the ground of laches.

Defendants next contend that plaintiffs have waived any claim for the alleged underpayments. "A waiver is the voluntary abandonment or relinquishment of a known right. It is essentially a matter of intent which must be proved." *Jefpaul Garage Corp. v. Presbyterian Hosp. in City of New York*, 61 N.Y.2d 442, 446, 474 N.Y.S.2d 458, 459–60, 462 N.E.2d 1176, 1177–78 (1984). Defendants have offered no evidence to show that plaintiffs had actual knowledge of the existence of their claim until, as plaintiffs' say, they uncovered its existence in the course of discovery in this litigation. While it may be that plaintiffs' continued dealings with defendants over many years without objecting to the alleged underpayments could support an inference of waiver *if* plaintiffs actually had known of the underpayments, defendants have failed to establish such actual knowledge. At most, defendants have shown that plaintiffs should have known of the existence of their claim, but they have not demonstrated the absence of a genuine issue of fact as to whether plaintiffs intended to waive the claim.

Defendants next point out that claims for any alleged underpayments that accrued prior to July 2, 1987 fall outside the applicable six year limitations period,[31] calculated from the date that the third amended complaint was filed. Plaintiffs argue that the statute of limitations is tolled on the ground that defendants fraudulently concealed from them the existence of the claim by hiding subscription data.

Under New York law, unless the applicable statute of limitations contains a provision tolling the statute until discovery of the injury, the statute is not tolled by concealment, although a party may be estopped from raising the statute as a bar to the suit. *See Simcuski v. Saeli*, 44 N.Y.2d 442, 448–49, 406 N.Y.S.2d 259, 262, 377 N.E.2d 713, 716 (1978) ("[A] defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action."); *General Stencils v. Chiappa*, 18 N.Y.2d 125, 128, 272 N.Y.S.2d 337, 340, 219 N.E.2d 169, 171 (1966). The Court therefore will consider whether defendants are estopped to plead the defense of the statute of limitations.

Defendants correctly state that they were under no duty to apprise plaintiffs of the existence of their claim, if one existed, and that any failure to do so would not estop them to plead the statute of limitations. *See Jordan v. Ford Motor Co.*, 73 A.D.2d 422, 424, 426 N.Y.S.2d 359, 361 (4th Dept.1980). Plaintiffs, as the party invoking the exception

---

**30.** Indeed, it is debatable, to say the least, whether testimony of any of these witnesses would be available over an objection based on the parol evidence rule.

**31.** N.Y. CPLR § 213.2 (McKinney 1990).

to the statute of limitations, bear the burden of proving that defendants induced them to refrain from bringing suit by fraud, misrepresentation, or deceit. *Park Associates v. Crescent Park Associates,* 159 A.D.2d 460, 461, 552 N.Y.S.2d 314, 315 (2d Dept.1990). Here, plaintiffs have alleged, at most, that defendants failed to share subscription information with them, although plaintiff Liebowitz's own declaration contradicts that assertion. (*See* Dabney Decl. ¶ 4 & Ex. H) They have offered no evidence to show that they sought such information from defendants or that defendants actively concealed the information. Nor have they offered any evidence that would support an inference of diligence in trying to uncover the existence of their claim. To the extent that any evidence has been produced, plaintiff Liebowitz's declaration indicates that the circulation data in fact were made available to plaintiffs. In these circumstances, plaintiffs have failed to raise a genuine factual issue on their contention that defendants are estopped to rely upon the statute of limitations. *See T & N PLC v. Fred S. James & Co. of New York, Inc.,* 29 F.3d 57, 62 (2d Cir.1994); *Park Associates,* 159 A.D.2d at 461, 552 N.Y.S.2d at 314.

■ Plaintiffs assert also that this count of the third amended complaint relates back to the first complaint, filed July 3, 1991, so that the statute, even if applicable, would bar only that portion of the claim that relates to underpayments alleged to have been made prior to July 3, 1985.

Rule 15(c) provides that a claim asserted in an amended complaint relates back to the original pleading if it "arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." FED.R.CIV.P. 15(c)(2). Plaintiffs contend that their original complaint "put in issue the entire AERDCO–Pergamon relationship from its inception through 1991, which by definition includes the 1979 Agree-

ment." (Pl.Mem. at 22) Both sides cite *Green v. Wolf Corp.,* 50 F.R.D. 220, 224 (S.D.N.Y.1970), which characterizes the question of relation back as a question whether "the original pleading gives fair notice of the general fact situation out of which the claim arises." Plaintiffs, however, read the words "general fact situation" quite broadly, apparently contending that the original complaint should be read to put in issue any claim that arises out of their relationship with defendants since 1967.

*Green v. Wolf Corp.* held that the analysis in applying Rule 15(c) "should be focused upon the general wrong and conduct complained of in the original pleading and to what extent the claim sought to be added by way of amendment departs therefrom." *Id.* Following that approach, the Court observes that the original complaint alleged—in some cases against defendants other than those now remaining in the case—conversion of plaintiffs' trademarks, trademark infringement, breach of certain duties as co-venturers, and breach of the 1971 Agreement. Nowhere, however, did the original complaint allege even the existence of the 1979 Agreement which plaintiffs now contend has been breached. Nor did the original complaint refer to the alleged underpayments which form the basis for this new claim. In these circumstances, the wrong suffered and the conduct causing the wrong do not appear in the original complaint and the third amended complaint does not simply set forth more fully the same matter alleged in the original complaint. Nor is the subject of the controversy the same. *See Koon v. Lakeshore Contractors,* 128 F.R.D. 650, 653 (W.D.Mich. 1988). Count IV therefore does not relate back to the original complaint.

The statute of limitations bars that portion of the claim that accrued more than six years prior to the date of the third amended complaint.[32] Accordingly, defendants' motion is

---

**32.** Defendants contend in their reply brief, for the first time, that the *entire* claim is barred because plaintiffs assert that defendants began underpaying them for the two journals in question, C & S and COMPUTERS & CHEMISTRY, more than six years prior to the date of the third amended complaint. It is well settled, however, that claims for installment payments due under a

contract or claims for breaches of a contract calling for a continuing performance, such as the annual payments due under the 1979 agreement, accrue as they become due. 4 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS §§ 949, 951 & 956 (1951). *Walsh v. Andorn,* 33 N.Y.2d 503, 355 N.Y.S.2d 329, 311 N.E.2d 476 (1974), cited by defendants, is not to the contrary. *Walsh* held

granted to the extent that so much of Count IV as seeks recovery of alleged underpayments prior to July 2, 1987 is dismissed.

■ What remains is defendants' motion for summary judgment dismissing on the merits that portion of Count IV pertaining to alleged underpayments made after July 2, 1987 and before January 1, 1989.[33] Defendants contend that they in fact overpaid plaintiffs during this period.

As defendants read the 1979 Agreement, it provides that Pergamon was to pay AERDCO a minimum payment of $120,000 per year, with an additional $10,000 for each Computer Series journal that exceeded the relevant subscription level. Thus, assuming *arguendo* that C & E and COMPUTERS & CHEMISTRY exceeded the applicable subscription level, they conclude that Pergamon owed AERDCO $140,000 per year. They contend that Pergamon paid AERDCO at the annual rates of $161,050 in 1987 and, apparently, $177,238 in 1988.[34] (Def. 3(g) ¶¶ 44–50 & Ex. 33)

Plaintiffs contend that the terms "Computer Journals" and "Computer Series," as used in the 1979 Agreement, did not include C & S and EFM. Much of the amounts paid to AERDCO in 1987 and 1988, plaintiffs contend, was paid on account of C & S and EFM. When payments for C & S and EFM are deducted from the total amounts paid to AERDCO by Pergamon in 1987 and 1988, plaintiffs assert that the remainder is less than the $140,000 allegedly due to AERDCO. Plaintiffs offer two letters from Pergamon to

AERDCO, both dated in 1985, as evidence that the 1979 Agreement excluded C & S and EFM. The two letters indicate that Pergamon would pay AERDCO an "additional" $20,000 annually for each of C & S and EFM. (Pl. 3(g) Ex. 65) While these letters may not be determinative of the meaning of the terms "Computer Series" and "Computer Journals" as used in the 1979 Agreement, they clearly suggest that, at least as of 1986, $40,000 more was to be paid annually to AERDCO. Thus, plaintiffs contend, they were owed a minimum of $180,000—the sum of the $120,000 minimum payment provided for in the 1979 Agreement, plus a $10,000 bonus for C & E, plus a $10,000 bonus for COMPUTERS & CHEMISTRY, plus the additional $20,000 for EFM, plus the additional $20,000 for C & S. If so, both the $161,050 rate in 1987 and the $177,238 rate in 1988 at which Pergamon claims that it paid AERDCO would be less than what was due. Defendants' reply papers do not address the 1985 letters.

Defendants, however, claim that payments to AERDCO were reduced beginning in January 1988 by $16,666 per quarter, in order to repay a $200,000 interest-free loan that Pergamon extended to AERDCO. (Def. 3(g) Ex. 34) A letter sent to AERDCO by Pergamon after the commencement of this litigation purports to provide a schedule of payments to AERDCO from 1979 through 1988, including credits toward repayment of the loan.[35] This document separately accounts for amounts paid for EFM, while apparently including C & S in the Computer Series.

---

that a plaintiff claiming to be the widow of a police officer did not have multiple causes of action for pension benefits where her status as the officer's wife and, consequently, her right to the pension, had not been established within six years of the officer's death. The Court of Appeals expressly stated, however, that each of the individual pension payments would have been subject to an individual period of limitation, commencing as each payment came due, if the underlying right to the pension had been duly established. 33 N.Y.2d at 507, 355 N.Y.S.2d at 331, 311 N.E.2d at 477. Here there is no dispute that plaintiff AERDCO was entitled under the 1979 Agreement to additional payments of $10,000 for each journal that met the specified conditions and, unlike the plaintiff in *Walsh*, plaintiffs need not seek a declaratory judgment establishing their standing.

**33.** *See* n. 28 *supra.*

**34.** The Court has derived the 1988 figure from figures contained at paragraphs 47–50 of Defendants' 3(g) Statement. Defendants contend that Pergamon paid AERDCO at a rate of $171,050 per year for the first three quarters of 1988. They contend that the annual rate was increased to $195,802 effective October 1, 1988. Thus the annual payments to AERDCO for 1988 should have totaled $177,238. Despite this, Exhibit 35 to Defendants' 3(g) Statement indicates that Pergamon paid AERDCO a total of $171,050 for 1988.

**35.** The letter warns, however, that Pergamon did not know if its records were complete. (Def. 3(g) Ex. 35)

Adding amounts credited toward reduction of the outstanding loan balance, this schedule indicates that Pergamon paid AERDCO a total of $161,050 for 1987 and $171,050 for 1988.[36] The 1992 letter allocates $21,050 of the 1987 payment and $31,050 of the 1988 payment to EFM. Thus, if EFM only were excluded from the Computer Series, and C & S were included, the amounts paid for the Computer Series, including credit for loan repayments, would total $140,000 for 1987 and $140,000 for 1988. This amount, however; still would not account for the additional $20,000 which Pergamon apparently agreed in 1985 to pay annually for C & S. Of course if C & S were excluded as well the amounts paid would be even more deficient.

Defendants argue that the ambiguous term "Computer Series" in the 1979 Agreement included both C & S and EFM. Pergamon's 1992 letter suggests, however, that it regarded EFM as separate. The evidence that defendants rely upon to argue that both C & S and EFM were part of the Computer Series as that term was used in the 1979 Agreement is inconclusive. They look to the 1989 Agreement that replaced the 1979 Agreement. There, paragraphs one and two discuss EFM and C & S, while paragraph three discusses "the remaining current journals in the Computer Series." Defendants argue that the word "remaining" in paragraph three distinguishes the journals discussed there from those discussed in paragraphs one and two. It seems equally likely, however, that the words "remaining *current* journals" (emphasis added) distinguishes the journals discussed in paragraph three from those Computer Series journals that had been discontinued; rather than from those discussed in paragraphs one and two.[37] Moreover, the 1971 Agreement which created the Computer Series set forth a list of a number of journals that might be included in the series. (Pl. 3(g) Ex. 11E ¶ 1) The list did not include C & S or EFM. (*Id.*) In fact, the same document expressly excluded C & S from the agreement creating the series.

(*Id.* at ¶ 6) Defendants note that plaintiff Liebowitz seems to have included C & S in the Computer Series in a 1975 letter. (Def. 3(g) Ex. 27) Thus there are documents that suggest that the 1979 Agreement did include C & S, and there are documents that suggest that it did not. There does not seem to be evidence that EFM was included in the 1979 Agreement. Thus, the most that defendants have established is that the term "Computer Series" as used in the 1979 Agreement is ambiguous.

There is clearly a genuine dispute as to whether the 1979 Agreement applied to C & S and EFM. In these circumstances, defendants have failed to carry their burden on a motion for summary judgment. Without proof that both EFM and C & S are included in the 1979 Agreement it appears that any of the various amounts that Pergamon is alleged to have paid to AERDCO in 1987 and 1988 would have been insufficient. The motion for summary judgment therefore is denied as to that portion of Count IV that is not time-barred.

*The Claim Under Paragraph Three of the 1989 Agreement (Count V)*

Plaintiffs claim that paragraph three of the 1989 Agreement obligated Pergamon in 1992 to commence paying AERDCO $10,000 per year for each journal in the Computer Series that, as of the date of the 1989 Agreement, had not been receiving a $10,000 annual subscription "bonus" payment of the kind at issue in the immediately preceding discussion. The relevant portion of the 1989 Agreement provides:

"For the remaining current journals in the Computer Series, AERDCO will receive from Pergamon Press One Hundred and Twenty Thousand Dollars ($120,000) paid per annum in four (4) equal instalments commencing 31 March 1989. AERDCO will forego the Ten Thousand Dollars ($10,000) start-up fee at the initiation of a new journal in the Computer Series; however, AERDCO will receive from Perga-

---

**36.** The $171,050 figure contained in this 1992 letter from Pergamon contradicts defendants' assertion that the rate at which Pergamon paid AERDCO was increased in the fourth quarter of 1988. *See* n. 34 *supra.*

**37.** In November 1974 certain journals in the series were discontinued. (Pl. 3(g) Exs. 16 & 28)

mon Press an additional Ten Thousand Dollars ($10,000) per annum fee, payable in quarterly payments commencing 31 March 1992, for each remaining journal in which AERDCO is not as of the date of this letter receiving a Ten Thousand Dollar ($10,000) annual fee for said journal." (Pl. 3(g) Ex. 25 ¶ 3)

Thus, plaintiffs claim that they are owed $10,000 per year since 1992 for each of the five journals for which they claim that they were not receiving the $10,000 bonus at the time that the 1989 Agreement was negotiated.[38]

Defendants regard the $120,000 fee provided for in the first sentence of paragraph three as a fee of $10,000 for each of the twelve journals, excluding C & S and EFM, which they believe constituted the Computer Series. Thus, they argue that AERDCO was receiving for each journal in the series "a Ten Thousand Dollar ($10,000) annual fee for said journal." Therefore, according to defendants, no obligation arose in 1992 to make additional $10,000 payments because there were no Computer Series journals in publication in 1992 that, as of the date of the 1989 Agreement, were not receiving a $10,000 fee.

Nothing in the language of paragraph three suggests, however, that the $120,000 fee was attributable in separate $10,000 increments to each journal then included in the Computer Series. Nor have defendants offered any evidence that this was the intent of the parties in negotiating this provision. Plaintiffs argue that the additional payment provision would have been meaningless if they were already receiving $10,000 for each journal in publication at the time of the 1989 Agreement. Defendants do not dispute that a contract should be interpreted to give meaning to all of its provisions. *See, e.g., Morgan, Olmstead, Kennedy & Gardner, Inc. v. Federal Ins. Co.,* 637 F.Supp. 973, 977 (S.D.N.Y.), *aff'd,* 833 F.2d 1003 (2d Cir.1986). Instead, they contend that there was a journal, which they identify as COMPUTING SYSTEMS IN ENGINEERING, in the series at the

time of the 1989 Agreement for which AERDCO was not receiving a fee of any kind. As evidence of this they direct the Court to a letter dated May 1, 1989 from Robert Miranda of Pergamon to Professor Liebowitz. The letter, in its entirety, states:

"Please accept this letter as confirmation that the Journal of COMPUTING SYSTEMS IN ENGINEERING is part of the computer series of journals established by AERDCO.

"Pergamon Press appreciates the work you did in helping negotiate this contract and bringing the journal to fruition." (Def. 3(g) Ex. 27)

This letter clearly says nothing about whether plaintiffs were receiving any fee for COMPUTING SYSTEMS IN ENGINEERING. Even if it did, however, the mere fact that the interpretation proposed by defendants might escape plaintiffs' objection that defendants' reading would render a significant part of paragraph three meaningless is not a sufficient reason to adopt that interpretation when it is far from self-evidently correct. The language of the disputed provision does not unambiguously conform to defendants' interpretation. Even assuming that the disputed provision is ambiguous, rather than unambiguously consistent with plaintiffs' interpretation, the Court holds that defendants' failure to offer any evidence in support of their interpretation precludes summary judgment in their favor. The motion therefore is denied with respect to Count V.

*The Consumer Price Index Adjustment Claim (Count VI)*

■ Paragraph four of the 1989 Agreement provided that fixed payments from Pergamon to AERDCO, set out in paragraphs one and three of the Agreement, were to be adjusted according to the Consumer Price Index ("CPI"). The relevant provision reads:

"The fixed payments specified in paragraphs 1 and 3 above will be increased by

---

**38.** The journals involved are: COMPUTERS, ENVIRONMENT AND URBAN SYSTEMS, COMPUTERS AND ELECTRICAL ENGINEERING, COMPUTERS AND INDUSTRIAL ENGINEERING, C & E, and COMPUTERS AND CHEMISTRY The latter two they claim come within this clause of the

1989 Agreement since, although they contend that they were entitled to the payments, they were not receiving the payments at the time of the 1989 Agreement.

Pergamon Press for each of the succeeding years of this agreement according to the percentage of increase by which the United States Consumer Price Index (CPI, US average, all items, published by the Bureau of Labor Statistics, US Department of Labor) has moved upwards during the calendar year from 1 January of each preceding year to 1 January of each current year." (Pl. 3(g) Ex. 25 ¶ 4) [39]

Defendants contend that the contract unambiguously provides that payments are to be increased according to the sum of the CPI increases for the preceding years. This, they say, was done and the claim therefore should be dismissed. Plaintiffs read paragraph four as providing that the payments would increase in a compound fashion. Thus, plaintiffs argue that the cumulative but uncompounded increases defendants claim to have paid—14 percent in 1992, 17.3 percent in 1993, and 19.8 percent in 1994—were inadequate.[40]

The handwritten replacement of the words "the preceding year" with "each preceding year"[41] could support defendants' interpretation. If only the CPI increase for the preceding year was to be applied to the fixed payments, it would suggest that the "fixed payments" intended must have reflected prior years' adjustments.[42] But where the handwritten amendment indicates that "each" preceding year's CPI increase was to be applied, it might well suggest that each of the adjustments was to be applied to the base payment, rather than to an already adjusted base payment.

It is possible, however, that the handwritten change was not meant to alter but to clarify the meaning. Thus the handwritten word "each" could be interpreted to refer back to the printed word "each" earlier in the sentence, where it seems to say that the fixed payments due under the contract were themselves to be increased annually. Thus, in each succeeding year, that year's CPI increase would be applied to the prior year's adjusted payment. The result of that of course would be that the CPI increase would be compounded.

Plaintiffs offer evidence that the Bureau of Labor Statistics instructs that CPI increases should be compounded. (Pl. 3(g) Ex. 67B) Since it is the Bureau's standard that the parties adopted, plaintiffs argue that the parties must have intended to apply it as the Bureau directs. Defendants attempt to explain the parties' intent by contending that paragraph four, as they interpret it, provides that the fixed payments would be "held constant in real terms." (Def. Reply Mem. at 14) They argue that AERDCO's right to the annual payments accrued separately for each year and that the parties would have compounded the annual increase only if, in essence, they had intended to compensate AERDCO for the time value of money it had not yet earned. This, defendants contend, was not the parties' intent.

The interpretation of paragraph four offered by defendants is not unreasonable. It is not, however, the only reasonable interpretation. The Court cannot, as a matter of law, conclude that the contract unambiguously means what defendants claim that it means. Defendants' motion for summary judgment dismissing Count VI is denied.

---

**39.** As typed for signature, the clause had read:

"The fixed payments specified in paragraphs 1 and 3 above will be increased by Pergamon Press for each of the succeeding years of this agreement according to the percentage of increase by which the United States Consumer Price Index (CPI, US average, all items, published by the Bureau of Labor Statistics, US Department of Labor) has moved upwards during the calendar year from 1 January of the preceding year to 1 January of each current year." (Pl. 3(g) Ex. 25 ¶ 4)

The words "the preceding year," however, were altered by hand to read "each preceding year," and the change was initialed in the margin by the signatories to the agreement. (*Id.*)

**40.** Defendants' calculations appear at Def. 3(g) ¶¶ 61–68 & Ex. 47. Based on the annual CPI increases used by defendants, the Court estimates that the compounding proposed by plaintiffs would have produced an increase of 14.64 percent in 1992, 20.72 percent in 1993, and 21.24 percent in 1994.

**41.** *See* n. 39, *supra*.

**42.** Defendants do not suggest that the language was meant to apply only the one preceding year's CPI increase back to the base fixed payments.

### The Engineering Failure Analysis Claims (Counts VII and VIII)

Plaintiffs allege that, in 1994, defendants began publishing a journal known as Engineering Failure Analysis ("EFA") in a calculated attempt to compete with the long-established journal EFM, edited by plaintiff Liebowitz. They contend that the publication of EFA breaches both fiduciary and contractual duties owed by Pergamon to AERDCO. Plaintiffs find the source of these duties in AERDCO's relationship with Pergamon as its publisher, and in what they say was Pergamon's implied duty to use its best efforts to promote EFM. Plaintiffs seek punitive damages for the alleged breach of this fiduciary duty. Defendants deny that Pergamon owed a fiduciary duty to AERDCO, and they deny also that EFA is calculated to compete with EFM. In the absence of a breach of fiduciary duty, defendants contend that plaintiffs are not entitled to punitive damages as a matter of law.

Plaintiffs' claim that defendants stood in a fiduciary relationship to AERDCO is unsupported by the law. Ordinarily, a conventional business relationship does not give rise to a fiduciary duty. *Compania Sud–Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F.Supp. 411, 426 (S.D.N.Y.1992); *Oursler v. Women's Interart Center, Inc.*, 170 A.D.2d 407, 566 N.Y.S.2d 295 (1st Dept.1991).

Plaintiffs contend that they placed their trust in defendants by giving defendants exclusive rights to publish, market, and distribute EFM, and by agreeing to take a royalty on the net subscription revenue obtained by defendants from EFM. New York law, however, does not regard the relationship between a publisher and author, or between a licensor receiving royalty payments from a licensee, as establishing a fiduciary duty. *E.g., Sobol v. E.P. Dutton, Inc.*, 112 F.R.D. 99, 104 (S.D.N.Y.1986) (Weinfeld, J.). Instead, any duty owed in such a context normally is no more than the usual implied-in-law duty of good faith and fair dealing imposed on parties to any contract. *See Mellencamp v. Riva Music, Ltd.*, 698 F.Supp. 1154, 1156–59 (S.D.N.Y.1988). Defendants point out that the contracts between AERDCO and Pergamon have always provided that Pergamon publishes EFM at Pergamon's "own risk and expense." (*E.g.*, Pl. 3(g) Ex. 3) In light of that fact, and evidence that shows that the agreement to publish EFM reached between AERDCO and Pergamon was extensively negotiated and renegotiated at arms length and without over-reaching by Pergamon,[43] plaintiffs cannot, as a matter of law, meet their burden of proving the existence of circumstances that would give rise to a fiduciary duty owed by Pergamon to AERDCO. *See Moy v. Adelphi Institute, Inc.*, 866 F.Supp. 696, 708 (E.D.N.Y. 1994). Count VIII therefore is dismissed.[44]

Count VII, however, contends that the publication of EFA breaches Pergamon's implied contractual duty to use best efforts to market EFM and its implied duty of good faith and fair dealing. Defendants deny that Pergamon undertook to use its best efforts to promote EFM, and they contend that the publication of a journal on a related subject is not a breach of any such duty. They contend further that any duty of good faith that would prohibit them from publishing a journal that might compete with EFM would be contrary to the express terms of agreements between AERDCO and Pergamon and therefore may not properly be inferred from those agreements. *See Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 309, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983). Finally, they argue that EFA is not

---

**43.** (*E.g.*, Pl. 3(g) Exs. 2–5)

**44.** In light of the Court's dismissal of the claim under Count VIII for breach of fiduciary duty, defendants' motion to dismiss plaintiffs' prayer for punitive damages is granted. No claim remaining in the case can support such an award. *See Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir.1988) (trademark infringement, even if willful, cannot support punitive damage award), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989); *Durham Indus., Inc. v. North River Ins. Co.*, 673 F.2d 37, 41 (2d Cir.1982) (absent a high degree of moral turpitude or criminal indifference to civil obligations, breach of contract, even if willful and malicious, cannot support punitive damage award), *cert. denied*, 459 U.S. 827, 103 S.Ct. 61, 74 L.Ed.2d 64 (1982).

likely to compete in a significant way with EFM.

■ Defendants note that the agreements between AERDCO and Pergamon regarding EFM contain no express promise by Pergamon to use best efforts to promote EFM. This plaintiffs concede, but they argue that the exclusivity of their relationship with Pergamon imposed such a duty. As plaintiffs point out, an exclusive agency leaves the principal at the mercy of the agent. *See Martin Pincus Marketing v. Sawyer of Napa, Inc.*, 774 F.Supp. 171, 174 (S.D.N.Y.1991) (holding that it is implicit in an exclusive sales contract that the sales representative would use best efforts to market the manufacturer's product); *Wood v. Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917). An exclusive agent is held also to a duty of good faith. *Martin Pincus Marketing*, 774 F.Supp. at 174.

■ Defendants offer no serious response to these basic propositions. Instead, defendants contend that an implied duty not to initiate publication of a competing journal would be inconsistent with the express terms of the agreements between AERDCO and Pergamon. In support of this argument, defendants point to the following provision from the 1989 Agreement:

> "Before initiating a new journal in the Computer Series, both Pergamon Press and AERDCO will have to agree upon which particular journal or journals should be initiated in the Computer Series." (Pl. 3(g) Ex. 25 ¶ 3)

Defendants concede, indeed they assert, that EFA is not part of the Computer Series. They apparently contend that the express term above is the sole limitation on the parties' initiation of new journals and that any implied duty not to initiate other journals would conflict with this provision. The provision quoted, however, relates only to the process to be used by the parties in determining which of the journals that might be contemplated as part of the Computer Series would be published. The 1989 Agreement's

silence with regard to the initiation of any journals not included in the Computer Series does not imply that the parties affirmatively intended that they would be free to publish in bad faith journals intended to compete with journals published according to the Agreement, as plaintiffs allege defendants have done with EFA. Any such implied term would be far more inconsistent with the Agreement than the implied duty of good faith asserted by plaintiffs.

Defendants' final defense is that the publication of EFA does not breach any duty of good faith or best efforts obligation. They base this assertion on *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*,[45] which held that, even where a publisher has undertaken to publish an author's book, "a publisher has a general right to act in its own interests in a way that may incidentally lessen an author's royalties." 30 N.Y.2d at 36, 330 N.Y.S.2d at 334, 281 N.E.2d at 145. Accordingly, defendants offer evidence that tends to show that any impact that EFA might have on AERDCO's royalties from EFM would be incidental at most. (Shepherd Reply Decl. ¶¶ 4, 11) The promotion of one book, however, as was involved in *Van Valkenburgh*, is distinguishable from the promotion of a periodical. Moreover, at the time of the motions filed in this case, defendants had not responded to plaintiffs' discovery requests with regard to EFA and with regard to two discontinued journals which defendants claim that EFA replaced. (Carr Decl. ¶¶ 3–8) Plaintiffs therefore resist summary judgment on this Count under FED.R.CIV.P. 56(f).

Rule 56(f) provides:

"Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

---

**45.** 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972).

This Circuit adheres to a four-part test for determining the sufficiency of an affidavit requesting additional time to conduct discovery in order to respond to a summary judgment motion:

"The affidavit must include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994). *Accord, e.g., Hudson River Sloop Clearwater, Inc. v. Department of the Navy*, 891 F.2d 414, 422 (2d Cir.1989).

Plaintiffs' attorney has submitted a declaration indicating that, at the time their motion papers were due, replies to interrogatories and document requests that had been submitted to defendants were not yet due. Plaintiffs state that they sought information and documents relevant to the assertions made in defendants' moving papers that EFA fills "a gap in Elsevier's journal publishing business which was created by the discontinuance of [certain other journals]" and that the "initiation of EFA had nothing to do with the plaintiffs or this lawsuit." (Carr Decl. ¶¶ 3–5, quoting Def. 3(g) ¶¶ 75–76) Plaintiffs claim that they became aware that defendants would contend that EFA replaced pre-existing journals only when defendants filed their motion for summary judgment. (*Id.* ¶ 4) They assert that they therefore had not obtained copies of the journals EFA is alleged to have replaced, although they apparently sought copies in discovery after defendants filed their motion. (*Id.* ¶ 6)

The existence of other journals which EFA allegedly replaced is clearly relevant to the question whether EFA has had or may have a significant impact on EFM. Plaintiffs therefore should have an opportunity to rebut defendants' evidence that EFA replaced pre-existing journals. *See Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 152 (2d Cir.1990). The motion for summary judgment is denied with regard to Count VII, without prejudice to its renewal after

completion of discovery on the question of EFA's impact, if any, on EFM.

*The Currency Conversion Claim (Count X)*

Plaintiffs allege that defendants have cheated plaintiffs by varying the rates used for converting foreign currencies to U.S. dollars when paying plaintiffs the royalties due from subscription sales of EFM and C & S. Paragraph two of the 1989 Agreement provides that Pergamon is to pay AERDCO annually a royalty in the amount of five percent of the subscription revenues generated by C & S and EFM. The journals are distributed internationally and a portion of the subscribers pay defendants in foreign currencies. Defendants convert currencies other than dollars and British pounds into pounds for their own bookkeeping. They then convert pounds into dollars in order to pay plaintiffs the royalty in dollars. (Def. 3(g) Ex. 47) There does not seem to have been any dispute over these matters until after this litigation commenced. In a letter dated March 25, 1994, defendants informed plaintiffs that the royalty payments for 1993 had fallen as a result of weakness in the pound. (Carr. Decl. Ex. A) Plaintiffs say that they are not aware that their payments have ever been increased as a result of strength in the pound relative to the dollar. (Carr Decl. ¶ 11)

Defendants say that they have provided plaintiffs with documentation of the calculations used to determine plaintiffs' royalties. (Shepherd Reply Decl. Ex. C) Plaintiffs, however, state that they have not had an opportunity to conduct discovery on this matter and, under Rule 56(f), cannot be compelled to rely solely on the materials that defendants have seen fit to provide to them. It is not at all clear, however, why the discovery now sought by plaintiffs could not have been sought prior to or, at least, from the moment that the third amended complaint was filed. Unlike the claims relating to EFA, defendants did not raise in their defense to this claim anything that was not clearly in issue from the time the claim was made. Such delay in conducting discovery is an "insurmountable obstacle" to a Rule 56(f) application. *Thomas v. Stone Container Corp.*, 922 F.Supp. 950, 957 (S.D.N.Y.1996).

Defendants' motion for summary judgment on Count X, however, is denied for a different reason. The materials provided by defendants cover only 1993 and 1994. The currency conversion figures under the 1989 Agreement for 1989–92, the years prior to the commencement of this litigation, do not appear in the record. Plaintiffs allege that they were first made aware of the effect of currency fluctuations on their compensation under the 1989 Agreement after commencement of this litigation. (Carr Decl. ¶ 11)

Defendants have the burden on their motion of showing the absence of any genuine issue of fact as to their compliance with the parties' Agreement. While they are correct that no method was specified in the Agreement for calculating currency conversions, the Agreement nevertheless bound them to calculate any such conversions with regard for their implied duty of good faith and fair dealing. *Wigand v. Bachmann–Bechtel Brewing Co.*, 222 N.Y. 272, 277, 118 N.E. 618, 619 (1918). Without data for the years prior to the commencement of this litigation it is simply impossible to conclude that no genuine issue of disputed fact exists as to whether defendants altered their method for calculating currency conversions as a result of plaintiffs' initiation of this litigation. Accordingly, the motion for summary judgment dismissing Count X is denied.

### Conclusion

Plaintiffs' cross-motion for summary judgment on Count II is granted. Defendants' motion for summary judgment dismissing the complaint is granted with regard to Counts III, VIII, so much of Count IV as seeks recovery of alleged underpayments prior to July 3, 1985, and plaintiffs' claim for punitive damages. Defendants' motion is denied in all other respects.

SO ORDERED.